# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 11, 2015    Decided April 5, 2016

No. 15-3016

UNITED STATES OF AMERICA,
APPELLEE

v.

FOKKER SERVICES B.V.,
APPELLANT

Consolidated with 15-3017

Appeals from the United States District Court
for the District of Columbia
and Petition for the Writ of Mandamus
(No. 1:14-cr-00121-1)

*Edward C. O'Callaghan* argued the cause for appellant. With him on the briefs was *David D. DiBari*.

*Aditya Bamzai*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the briefs were *Vincent H. Cohen*, *Jr.*, Acting U.S. Attorney, *Mary B. McCord*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, *Steven M. Dunne*, Chief, Appellate Unit, and *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

*Adam G. Unikowsky* argued the cause for court-appointed amicus curiae. With him on the brief was *David W. DeBruin*, appointed by the court.

Before: SRINIVASAN, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: The Constitution allocates primacy in criminal charging decisions to the Executive Branch. The Executive's charging authority embraces decisions about whether to initiate charges, whom to prosecute, which charges to bring, and whether to dismiss charges once brought. It has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations, much less to impose its own charging preferences. The courts instead take the prosecution's charging decisions largely as a given, and assume a more active role in administering adjudication of a defendant's guilt and determining the appropriate sentence.

In certain situations, rather than choose between the opposing poles of pursuing a criminal conviction or forgoing any criminal charges altogether, the Executive may conclude that the public interest warrants the intermediate option of a deferred prosecution agreement (DPA). Under a DPA, the government formally initiates prosecution but agrees to dismiss all charges if the defendant abides by negotiated conditions over a prescribed period of time. Adherence to the conditions enables the defendant to demonstrate compliance with the law. If the defendant fails to satisfy the conditions, the government can then pursue the charges based on facts admitted in the agreement.

This case arises from the interplay between the operation of a DPA and the running of time limitations under the Speedy Trial Act. Because a DPA involves the formal initiation of criminal charges, the agreement triggers the Speedy Trial Act's time limits for the commencement of a criminal trial. In order to enable the government to assess the defendant's satisfaction of the DPA's conditions over the time period of the agreement—with an eye towards potential dismissal of the charges—the Speedy Trial Act specifically allows for a court to suspend the running of the time within which to commence a trial for any period during which the government defers prosecution under a DPA.

In this case, appellant Fokker Services voluntarily disclosed its potential violation of federal sanctions and export control laws. After extensive negotiations, the company and the government entered into an 18-month DPA, during which Fokker would continue cooperation with federal authorities and implementation of a substantial compliance program. In accordance with the DPA, the government filed criminal charges against the company, together with a joint motion to suspend the running of time under the Speedy Trial Act pending assessment of the company's adherence to the agreement's conditions. The district court denied the motion because, in the court's view, the prosecution had been too lenient in agreeing to, and structuring, the DPA. Among other objections, the court disagreed with prosecutors' decision to forgo bringing any criminal charges against individual company officers.

We vacate the district court's denial of the joint motion to exclude time under the Speedy Trial Act. We hold that the Act confers no authority in a court to withhold exclusion of time pursuant to a DPA based on concerns that the government should bring different charges or should charge

different defendants. Congress, in providing for courts to approve the exclusion of time pursuant to a DPA, acted against the backdrop of long-settled understandings about the independence of the Executive with regard to charging decisions. Nothing in the statute's terms or structure suggests any intention to subvert those constitutionally rooted principles so as to enable the Judiciary to second-guess the Executive's exercise of discretion over the initiation and dismissal of criminal charges.

In vacating the district court order, we have no occasion to disagree (or agree) with that court's concerns about the government's charging decisions in this case. Rather, the fundamental point is that those determinations are for the Executive—not the courts—to make. We therefore grant the government's petition for a writ of mandamus and remand for further proceedings consistent with this opinion.

I.

A.

The Speedy Trial Act establishes time limits for the completion of various stages of a criminal prosecution. *See* 18 U.S.C. §§ 3161-3174. For instance, the Act requires the commencement of trial within seventy days of the filing of an information or indictment by the government. *Id.* § 3161(c)(1). The Act also excludes various pretrial periods from the running of that seventy-day time clock. Of particular relevance, the Act excludes "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." *Id.* § 3161(h)(2).

5

That exemption exists to enable prosecutors to resolve cases through DPAs. DPAs, along with their out-of-court analogues, non-prosecution agreements (NPAs), afford a middle-ground option to the prosecution when, for example, it believes that a criminal conviction may be difficult to obtain or may result in unwanted collateral consequences for a defendant or third parties, but also believes that the defendant should not evade accountability altogether. Both DPAs and NPAs generally include an admitted statement of facts, require adherence to "conditions designed . . . to promote compliance with applicable law and to prevent recidivism," and remain in effect for a period of one to three years. U.S. Attorney's Manual § 9-28.1000 (2015). During that period, if the defendant fails to abide by the terms of the agreement, the government can prosecute based on the admitted facts. While prosecutors at one time seldom relied on NPAs and DPAs, their use has grown significantly in recent years.

DPAs differ from NPAs primarily with regard to the filing of criminal charges. With an NPA, "formal charges are not filed and the agreement is maintained by the parties rather than being filed with a court." Craig S. Morford, *Selection and Use of Monitors in Deferred Prosecution Agreements and Non-Prosecution Agreements with Corporations*, at 1 n.2 (Mar. 7, 2008). A DPA, by contrast, "is typically predicated upon the filing of a formal charging document by the government." *Id.*

For that reason, a DPA's viability depends on the specific exclusion of time for such agreements set forth in the Speedy Trial Act, 18 U.S.C. § 3161(h)(2). The filing of an information or indictment would ordinarily trigger the Act's seventy-day clock within which trial must commence. *See id.* § 3161(c)(1). But in the case of a DPA, if the defendant were to fulfill the agreement's conditions, the prosecution would move to dismiss all charges with prejudice at the end of the

specified time period, ordinarily one to three years. Without the statutory exclusion of time for DPAs provided in § 3161(h)(2), the government would relinquish its ability to prosecute based on the conceded facts if the defendant were to violate the agreement after seventy days. That would largely eliminate the leverage that engenders the defendant's compliance with a DPA's conditions. The statutory exclusion of time for DPAs therefore is essential to the agreements' effective operation.

## B.

Fokker Services, a Dutch aerospace services company, provides technical and logistical support to owners of aircraft manufactured by its predecessor company. In 2010, Fokker voluntarily disclosed to the United States Departments of Treasury and Commerce that it had potentially violated federal sanctions and export control laws concerning Iran, Sudan, and Burma. At the time Fokker came forward, no government agency had initiated any investigation focused on the company.

Over the course of the next four years, Fokker cooperated in the wide-ranging investigation conducted by federal authorities. The company facilitated interviews of relevant witnesses, expedited the government's requests to Dutch authorities for documents under the Mutual Legal Assistance Treaty, and initiated its own internal investigation. Fokker's internal investigation revealed that, from 2005 to 2010, the company had participated in 1,147 illicit transactions through which it earned some $21 million in gross revenue. The company instituted remedial measures to improve its sanctions compliance program, adopting a set of procedures to track parts and bolstering its employee training requirements. It also fired its president and demoted or reassigned other employees who had been involved in the

violations. The company's compliance efforts have been described by government officials as "a model to be followed by other corporations." Gov't Supp. Mem. in Support of DPA Reached with Fokker Services, B.V., at 15.

In light of Fokker's cooperation, remediation efforts, and other mitigating factors, federal agencies negotiated a global settlement with the company. The settlement included, as an integral component, an 18-month DPA. During the DPA's 18-month period, Fokker was to: continue full cooperation with the government, implement its new compliance policy, and pay fines and penalties totaling $21 million (a sum equaling the gross revenues gained by the company from the illicit transactions). Fokker also accepted responsibility for the acts described in the stipulated factual statement accompanying the DPA.

On June 5, 2014, pursuant to the agreement, the government filed with the district court a one-count information against Fokker, together with the DPA. The information charged Fokker with conspiracy to violate the International Emergency Economic Powers Act. *See* 18 U.S.C. § 371; 50 U.S.C. § 1705. The same day, the government and Fokker filed a joint motion for the exclusion of time under the Speedy Trial Act, in order to "allow [the company] to demonstrate its good conduct and implement certain remedial measures." Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act, at 1.

The district court then held a series of status conferences, during which it repeatedly emphasized its concerns about the absence of any criminal prosecution of individual company officers. Tr. of Status Conference (June 25, 2014), at 4; Tr. of Status Conference (July 9, 2014), at 5. The court requested several additional written submissions from the government. The government was asked to explain why the interests of

justice supported the court's approval of the deal embodied by the DPA, and also to address whether Fokker's initial disclosures to the government had in fact been voluntary. *See* Tr. of Status Conference (June 25, 2014), at 3-4; Tr. of Status Conference (July 9, 2014), at 5-6. In response, the government described why the "proposed resolution with Fokker Services is fair and is an appropriate exercise of the government's discretion," Gov't Mem. in Support of DPA Reached with Fokker Services, B.V., at 2, and affirmed the absence of any indication "that Fokker Services was motivated to make its disclosures out of fear about a nonexistent U.S. government investigation," Gov't Status Report, at 15. The district court later expressed that it might still reject the DPA because it was "too good a deal for the defendant." Tr. of Status Conference (Oct. 29, 2014), at 4.

On February 5, 2015, the district court denied the joint motion for the exclusion of time. In explaining the reasons for its decision, the court criticized the government for failing to prosecute any "individuals . . . for their conduct." *United States v. Fokker Services, B.V.*, 79 F. Supp. 3d 160, 166 (D.D.C. 2015). According to the court, approval of an agreement in which the defendant had been "prosecuted so anemically for engaging in such egregious conduct for such a sustained period of time and for the benefit of one of our country's worst enemies" would "promote disrespect for the law." *Id*. at 167. The court further noted that certain employees had been permitted to remain with the company; that the DPA contained no requirement for an independent monitor; and that the amount of the fine failed to exceed the revenues Fokker gained from the illegal transactions. *Id*. at 166. Based on those considerations, the court rejected the DPA as an "[in]appropriate exercise of prosecutorial discretion." *Id*. at 167.

The district court's order marks the first time any federal court has denied a joint request by the parties to exclude time pursuant to a DPA. Both parties filed a timely notice of appeal. Because both parties seek to overturn the district court's denial of their joint motion to exclude time, we appointed an amicus curiae to present arguments defending the district court's action.

II.

Although we face a threshold question concerning our jurisdiction to review the district court's interlocutory order, our assessment of the jurisdictional issue is substantially informed by our consideration of the merits of the parties' challenge to the district court's action. Consequently, in accordance with our approach in parallel circumstances, *see In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014), we first consider whether the district court legally erred in its denial of the joint motion to exclude time pursuant to the DPA. We conclude that it did.

By rejecting the DPA based primarily on concerns about the prosecution's charging choices, the district court exceeded its authority under the Speedy Trial Act. The Act excludes any period of time "during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 18 U.S.C. § 3161(h)(2). While the exclusion of time is subject to "the approval of the court," there is no ground for reading that provision to confer free-ranging authority in district courts to scrutinize the prosecution's discretionary charging decisions. Rather, we read the statute against the background of settled constitutional understandings under which authority over criminal charging decisions resides fundamentally with the Executive, without

the involvement of—and without oversight power in—the Judiciary. So understood, the statute's "approval of the court" requirement did not empower the district court to disapprove the DPA based on the court's view that the prosecution had been too lenient.

## A.

The Executive's primacy in criminal charging decisions is long settled. That authority stems from the Constitution's delegation of "take Care" duties, U.S. Const. art. II, § 3, and the pardon power, *id*. § 2, to the Executive Branch. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *In re Aiken Cnty.*, 725 F.3d 255, 262-63 (D.C. Cir. 2013). Decisions to initiate charges, or to dismiss charges once brought, "lie[] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986). The Supreme Court thus has repeatedly emphasized that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979); *see Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Correspondingly, "judicial authority is . . . at its most limited" when reviewing the Executive's exercise of discretion over charging determinations. *Pierce*, 786 F.2d at 1201; *see ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987). The decision whether to prosecute turns on factors such as "the strength of the case, the prosecution's general deterrence value, the [g]overnment's enforcement priorities, and the case's relationship to the [g]overnment's overall enforcement plan." *Wayte v. United States*, 470 U.S. 598, 607 (1985). The Executive routinely undertakes those assessments and is well equipped to do so. By contrast, the

Judiciary, as the Supreme Court has explained, generally is not "competent to undertake" that sort of inquiry. *Id.* Indeed, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967). "Judicial supervision in this area" would also "entail[] systemic costs." *Wayte*, 470 U.S. at 608. It could "chill law enforcement," cause delay, and "impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465 (quotation omitted). As a result, "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Id.* at 464 (internal quotation marks, quotation, and alterations omitted).

## B.

Those settled principles counsel against interpreting statutes and rules in a manner that would impinge on the Executive's constitutionally rooted primacy over criminal charging decisions. Of particular salience, Rule 48(a) of the Federal Rules of Criminal Procedure requires a prosecutor to obtain "leave of court" before dismissing charges against a criminal defendant. Fed. R. Crim. P. 48(a). That language could conceivably be read to allow for considerable judicial involvement in the determination to dismiss criminal charges. But decisions to dismiss pending criminal charges—no less than decisions to initiate charges and to identify which charges to bring—lie squarely within the ken of prosecutorial discretion. *See e.g.*, *Newman*, 382 F.2d at 480. To that end, the Supreme Court has declined to construe Rule 48(a)'s "leave of court" requirement to confer any substantial role for courts in the determination whether to dismiss charges.

Rather, the "principal object of the 'leave of court' requirement" has been understood to be a narrow one—"to protect a defendant against prosecutorial harassment . . . when the [g]overnment moves to dismiss an indictment over the defendant's objection." *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977). A court thus reviews the prosecution's motion under Rule 48(a) primarily to guard against the prospect that dismissal is part of a scheme of "prosecutorial harassment" of the defendant through repeated efforts to bring—and then dismiss—charges. *Id.*

So understood, the "leave of court" authority gives no power to a district court to deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority. For instance, a court cannot deny leave of court because of a view that the defendant should stand trial notwithstanding the prosecution's desire to dismiss the charges, or a view that any remaining charges fail adequately to redress the gravity of the defendant's alleged conduct. *See In re United States*, 345 F.3d 450, 453 (7th Cir. 2003). The authority to make such determinations remains with the Executive.

The same considerations have informed our understanding of the respective roles of the Executive and the courts with regard to the acceptance of certain civil consent decrees proposed by enforcement agencies. A provision of the Antitrust Procedures and Penalties Act, known as the Tunney Act, calls for a district court to enter a proposed antitrust consent decree if "in the public interest." 15 U.S.C. § 16(e). In *United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995), the Department of Justice filed a civil antitrust complaint against Microsoft, together with a proposed consent decree embodying the parties' settlement of the case. *Id.* at 1452. The district court denied approval of the consent decree based on a belief that the complaint and

decree were inadequate in scope to address Microsoft's objectionable conduct. *Id.* at 1452-55. The court concluded that the consent decree therefore failed to satisfy the statute's "public interest" standard.

We reversed the district court and remanded for entry of the proposed decree. The appellants argued that the district judge had understood his authority under the statute's "public interest" provision unduly expansively, so as to enable him to "bas[e] his rejection of the decree on considerations which implicate the executive branch's prosecutorial discretion." *Id.* at 1457. We agreed, explaining that the "public interest" standard did not "empower[]" the district judge to reject "the remedies sought" in the consent decree "merely because he believed other remedies were preferable." *Id.* at 1460. Moreover, we indicated that the district "court was barred from reaching beyond the complaint to examine practices the government did not challenge." *Id.* To be sure, a "district judge is not obliged to accept" a proposed decree "that, on its face and even after government explanation, appears to make a mockery of judicial power." *Id.* at 1462. But "[s]hort of that eventuality," we explained, "the Tunney Act cannot be interpreted as an authorization for a district judge to assume the role of Attorney General." *Id.* Consequently, a district court should not "reject a consent decree simply because it believes the [g]overnment could have negotiated a more exacting decree," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199 (D.C. Cir. 2004), or because it believes the government "failed to bring the proper charges," *SEC v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 297 (2d Cir. 2014).

As we have since explained, we "construed the public interest inquiry" under the Tunney Act "narrowly" in "part because of the constitutional questions that would be raised if courts were to subject the government's exercise of its prosecutorial discretion to non-deferential review." *Mass.*

*Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997); *see Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003). The upshot is that the "public interest" language in the Tunney Act, like the "leave of court" authority in Rule 48(a), confers no new power in the courts to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions.

### C.

The same considerations govern our interpretation of the Speedy Trial Act provision at issue here. That provision, as noted, allows for excluding "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to [a DPA], with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." 18 U.S.C. § 3161(h)(2). As with the "leave of court" language in Rule 48(a) and the "public interest" authority in the Tunney Act, we construe the "approval of the court" language in § 3161(h)(2) in a manner that preserves the Executive's long-settled primacy over charging decisions and that denies courts substantial power to impose their own charging preferences.

As an initial matter, the context of a DPA, like that of Rule 48(a), concerns the prosecution's core prerogative to dismiss criminal charges. While dismissal under a DPA follows from the defendant's adherence to agreed-upon conditions over a specified period, the decision to seek dismissal pursuant to a DPA—as under Rule 48(a)— ultimately stems from a conclusion that additional prosecution or punishment would not serve the public interest. Dismissal in either situation thereby fulfills the Executive's duty under Article II to see that the laws are faithfully executed. *See Pierce*, 786 F.2d at 1201.

We see no reason to recognize a substantially broader authority for courts to scrutinize prosecutorial charging choices in the context of a DPA than in the context of Rule 48(a). Just as Rule 48(a)'s "leave of court" authority does not allow a court to withhold approval of a motion to dismiss charges based on a belief that more serious charges should be brought against the defendant (or against a third party), § 3161(h)(2)'s "approval of the court" authority does not permit a court to withhold approval of a motion to exclude time under a DPA based on that same belief. In either situation, the court's withholding of approval would amount to a substantial and unwarranted intrusion on the Executive Branch's fundamental prerogatives. And the Judiciary's lack of competence to review the prosecution's initiation and dismissal of charges, *see Wayte*, 470 U.S. at 607-08, equally applies to review of the prosecution's decision to pursue a DPA and the choices reflected in the agreement's terms. As with conventional charging decisions, a DPA's provisions manifest the Executive's consideration of factors such as the strength of the government's evidence, the deterrence value of a prosecution, and the enforcement priorities of an agency, subjects that are ill-suited to substantial judicial oversight. *Id.*

To be sure, the criminal charges filed as part of a DPA remain on the court's docket throughout the time of the agreement (i.e., pending assessment of whether the defendant has satisfied the agreement's conditions, upon which the prosecution seeks dismissal of the charges). But the existence of charges on the court's docket suggests no greater power on the part of the court to second-guess the underlying charging decisions than under Rule 48(a): there, too, criminal charges remain on the court's docket until dismissed. The key point is that, although charges remain pending on the court's docket under a DPA, the court plays no role in monitoring the defendant's compliance with the DPA's conditions. For

instance, defendants who violate the conditions of their DPA face no court-ordered repercussions. Rather, the prosecution—and the prosecution alone—monitors a defendant's compliance with the agreement's conditions and determines whether the defendant's conduct warrants dismissal of the pending charges. Just as is the case under Rule 48(a), the prosecution, after taking stock of the circumstances, concludes that continued pursuit of a criminal conviction is unwarranted.

A comparison to civil consent decrees is also instructive in this regard. Civil consent decrees not only remain on a court's docket, but the court—unlike with a DPA—can enforce the decree's terms through exercise of the contempt power. Even in the face of that enhanced judicial role, we have narrowly construed a court's "public interest" authority to review a proposed antitrust consent decree under the Tunney Act so as to avoid encroaching on the Executive's core discretion over enforcement decisions. *See Microsoft*, 56 F.3d at 1460-62; *Massachusetts School of Law*, 118 F.3d at 783. And as a general matter, Executive independence is assumed to be even more pronounced in the context of criminal charging decisions than in the context of civil enforcement decisions. *See In re Aiken County*, 725 F.3d at 264-65 n.9. In that light, we perceive no basis for concluding that courts have greater power to second-guess charging decisions when reviewing the terms of a DPA than when reviewing any other Executive exercise of criminal charging authority, including dismissals of charges under Rule 48(a).

The text of § 3161(h)(2) does not dictate any contrary conclusion. The statutory language ties the "approval of the court" requirement to the DPA's "purpose of allowing the defendant to demonstrate his good conduct." 18 U.S.C. § 3161(h)(2). We thus understand a court's approval authority for the exclusion of time under a DPA to have a

particular focus: i.e., to assure that the DPA in fact is geared to enabling the defendant to demonstrate compliance with the law, and is not instead a pretext intended merely to evade the Speedy Trial Act's time constraints. Whatever may be the precise contours of that authority of a court to confirm that a DPA's conditions are aimed to assure the defendant's good conduct, it does not permit the court to impose its own views about the adequacy of the underlying criminal charges. Rather, as under Rule 48(a), those core charging decisions remain the province of the Executive.

The Senate Committee Report accompanying the Speedy Trial Act reinforces that circumscribed understanding of a district court's "approval" authority under § 3161(h)(2). The report describes the phrase, "with the approval of the court," as designed to "assure[] that the court will be involved in the decision to divert and that the procedure will not be used by prosecutors and defense counsel to avoid the speedy trial time limits." S. Rep. No. 93-1021, at 37 (1974). That statement suggests that the judicial-approval requirement was not intended to impinge on the Executive's traditional independence over charging decisions. Rather, the requirement enables courts to assure that a DPA does not exist merely to allow evasion of speedy trial time limits, but instead serves the bona fide purpose of confirming a defendant's good conduct and compliance with law. The Senate Committee Report further describes § 3161(h)(2) as generally intended to "encourage the current trend among United States attorneys" of holding criminal charges in abeyance while defendants participate in rehabilitation programs. *Id.* at 36. Interpreting § 3161(h)(2) to empower courts to scrutinize the prosecution's underlying charging decisions would tend to discourage—not encourage—the prosecution's use of DPAs, contradicting the provision's apparent overarching object.

D.

In defending the notion that § 3161(h)(2)'s "approval of the court" language gives district courts substantial authority to second-guess the prosecution's charging decisions, amicus seeks to analogize a court's review of a DPA under § 3161(h)(2) to a court's review of a proposed plea agreement under Rule 11 of the Federal Rules of Criminal Procedure. That argument fails.

To begin with, even in the context of reviewing a proposed plea agreement under Rule 11, a district court lacks authority to reject a proposed agreement based on mere disagreement with a prosecutor's underlying charging decisions. Rule 11 states that a district court may "accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Fed. R. Crim. P. 11(c)(3)(A). Although "district courts must exercise discretion in deciding whether to accept or reject a guilty plea, that discretion is not unfettered." *United States v. Maddox*, 48 F.3d 555, 556 (D.C. Cir. 1995). In particular, we have explained, "trial judges are not free to withhold approval of guilty pleas . . . merely because their conception of the public interest differs from that of the prosecuting attorney." *United States v. Ammidown*, 497 F.2d 615, 622 (D.C. Cir. 1973).

In addition, a district court's authority to "accept" or "reject" a proposed plea agreement under Rule 11 is rooted in the Judiciary's traditional power over criminal *sentencing*, as the Rule itself indicates in permitting the court to "defer a decision until the court has reviewed the presentence report." Fed. R. Crim. P. 11(c)(3)(A). Plea agreements can take roughly two forms: (i) charge bargains, in which a defendant agrees to plead guilty to certain charges in exchange for the dismissal of other charges; and (ii) sentence bargains, in which the defendant agrees to plead guilty to a particular

charge after the parties agree upon a sentence, which the prosecution then recommends to the sentencing court. *See United States v. Robertson*, 45 F.3d 1423, 1437 (10th Cir. 1995). In light of the Executive's traditional power over charging decisions and the Judiciary's traditional authority over sentencing decisions, *see Ammidown*, 497 F.2d at 619, some of our sister circuits have concluded that district courts have more limited authority to reject charge bargains than sentence bargains. *See Robertson*, 45 F.3d at 1439; *In re Vasquez-Ramirez*, 443 F.3d 692, 697-98 (9th Cir. 2006). Regardless, even in the case of a charge bargain, the court reviews the defendant's admitted conduct and enters a judgment of *conviction*, which in turn carries immediate sentencing implications.

The context of a DPA is markedly different. Unlike a plea agreement—and more like a dismissal under Rule 48(a)—a DPA involves no formal judicial action imposing or adopting its terms. Whereas a district court enters a judgment of conviction and then imposes a sentence in the case of a plea agreement, the court takes no such actions in the case of a DPA. Rather, the entire object of a DPA is to enable the defendant to *avoid* criminal conviction and sentence by demonstrating good conduct and compliance with the law. And a DPA's provisions are agreed to by the parties, not the court, with no occasion for the court to adopt the agreement's terms as its own. The court never exercises its coercive power by entering a judgment of conviction or imposing a sentence. It instead merely approves the prosecution's judgment that further pursuit of criminal charges is unwarranted, as it does when it approves a prosecutor's motion to dismiss charges under Rule 48(a). And as is the case when confronted with a motion to dismiss charges under Rule 48(a), a district court lacks authority to disapprove a

DPA under § 3161(h)(2) on the ground that the prosecution has been too lenient in its exercise of charging discretion.

E.

Judged by those principles, the district court in this case erred in denying the parties' motion for exclusion of time under § 3161(h)(2). There is no indication that the parties entered into the DPA to evade speedy trial limits rather than to enable Fokker to demonstrate its good conduct and compliance with law. Rather, the district court denied the exclusion of time based on its view that the prosecution should have brought different charges or sought different remedies. In doing so, the court exceeded its authority under § 3161(h)(2).

From the first status conference concerning the DPA, the district court repeatedly criticized the government for failing to bring charges against individual company officers. *See Fokker Services, B.V.*, 79 F. Supp. 3d at 166; Tr. of Status Conference (June 25, 2014), at 4; Tr. of Status Conference (July 9, 2014), at 5. Noting its belief that illegal conduct had been "orchestrated at the highest levels of the company," 79 F. Supp. 3d at 166, and unpersuaded by the government's efforts to ground its charging decisions in traditional prosecutorial considerations such as the strength of the evidence and the value of pursuing of different charges, *e.g.*, Gov't Mem. in Support of DPA Reached with Fokker Services, B.V., at 18-19, the district court questioned why no individuals would be held separately accountable. 79 F. Supp. 3d at 166. The court also faulted the government for "not requiring Fokker Services to pay as its fine a penny more than the $21 million in revenue it collected from its illegal transactions." *Id.* In addition, the court thought the prosecution should have required an independent monitor as

part of the DPA's terms. *See id.* The district court denied the motion for the exclusion of time for those reasons.

Even if the district court's criticisms of the prosecution's exercise of charging authority were entirely meritorious—an issue we have no occasion to address—the court should not have "assume[d] the role of Attorney General," *Microsoft*, 56 F.3d at 1462. Rather, the court should have confined its inquiry to examining whether the DPA served the purpose of allowing Fokker to demonstrate its good conduct, as contemplated by § 3161(h)(2). There is no reason to question the DPA's bona fides in that regard, *see* Deferred Prosecution Agreement, at 4-7; Gov't Supp. Mem. in Support of DPA Reached with Fokker Services, B.V., at 15-16, and the district court made no suggestion otherwise. And insofar as a court has authority to reject a DPA if it contains illegal or unethical provisions, *see United States v. Saena Tech Corp.*, 2015 WL 6406266, at *17-19 (D.D.C. Oct. 21, 2015); *United States v. HSBC Bank USA, N.A.*, 2013 WL 3306161, at *7 (E.D.N.Y. July 1, 2013), the district court again made no such suggestion here. The court instead denied the exclusion of time under § 3161(h)(2) based on a belief that the prosecution had been unduly lenient in its charging decisions and in the conditions agreed to in the DPA. The court significantly overstepped its authority in doing so.

### III.

Having determined that the district court erred in denying the motion to exclude time, we now decide whether to grant a writ of mandamus to correct that error. *See* 28 U.S.C. § 1651; *Kellogg Brown & Root*, 756 F.3d at 760. Mandamus is a "drastic and extraordinary" remedy "reserved for really extraordinary cases." *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 380 (2004). Before a court may issue the writ, three conditions must be satisfied:

(i) the petitioner must have "no other adequate means to attain the relief he desires"; (ii) the petitioner must show that his right to the writ is "clear and indisputable"; and (iii) the court "in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id*. at 380-81. All of those conditions are met here.

A.

First, a mandamus petitioner must lack any "other adequate means to attain the relief he desires." *Id*. at 380. That condition is satisfied in this case because interlocutory appeal is unavailable, and appeal after final judgment would be an inadequate form of relief.

With respect to the possibility of interlocutory appeal, the defendant in a criminal case generally has no ability to obtain appellate review of an interlocutory order until she has been convicted and sentenced. *See, e.g.*, *United States v. MacDonald*, 435 U.S. 850, 857-61 (1978). The government has a statutory right to contest certain kinds of interlocutory orders in criminal cases. *See* 18 U.S.C. § 3731. But because the denial of a speedy trial exclusion does not fall within that statutory exception, we must determine whether the district court's order in this case is immediately appealable under the collateral order doctrine. We find it is not.

The collateral order doctrine serves as a limited exception to the final judgment rule. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). In order to fall within the exception, an interlocutory order must (i) "conclusively determine the disputed question"; (ii) "resolve an important issue completely separate from the merits of the action"; and (iii) "be effectively unreviewable on appeal from a final judgment" in the underlying action. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quoting *Coopers &*

*Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)). All three of those conditions must be satisfied for the ruling in question to qualify as an immediately-appealable collateral order. And because delay can be "fatal to the vindication of the criminal law," *Cobbledick v. United States*, 309 U.S. 323, 324 (1940), those conditions are applied "with the utmost strictness" in criminal cases, *Flanagan v. United States*, 465 U.S. 259, 265 (1984).

Here, we need not consider the first two prongs of the collateral order test because the third one alone precludes finding that the district court's ruling is an immediately-appealable collateral order. The Supreme Court has explained that "only a narrow group of claims" satisfies the condition of effective unreviewability. *United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 270 (1982). Generally, the order in question must implicate "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *MacDonald*, 435 U.S. at 860. Fokker and the government have different interests at stake in this appeal, and we consider them separately.

Fokker asserts that it possesses a right not to be tried, conferred by the DPA, which would be nullified if review were postponed until after final judgment. It is well established, however, that the "mere burden of submitting to trial proceedings that will be wasted if the appellant's position is correct does not support collateral order appeal." 15A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3911.4 (2d ed. 1992). Because Fokker's purported right to avoid trial does not "rest[] upon an explicit statutory or constitutional guarantee that trial will not occur," it does not satisfy the requirement of effective unreviewability. *Midland Asphalt Corp.*, 489 U.S. at 800-01; *see Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 877-78 (1994).

For its part, the government emphasizes that its right to an immediate appeal is grounded in the separation of powers. The government, however, fails to establish that the order falls within the "narrow group of claims" that qualify as effectively unreviewable. *Hollywood Motor Car Co.*, 458 U.S. at 270. In most criminal cases, the government is barred from appealing if it loses at trial and lacks standing to appeal if it prevails. As a result, if an interlocutory order infringes the separation of powers, the Executive ordinarily would be unable to vindicate its prerogatives after final judgment.

But here, the government could allow the speedy trial clock to expire and then appeal the district court's resulting dismissal of charges on the ground that the court should have granted the requested exclusion of time under § 3161(h)(2). To the extent the government's separation-of-powers claim is meritorious—i.e., the district court acted impermissibly in rejecting the DPA based on a disagreement with the prosecutor's charging decisions—the government could vindicate its claim after final judgment. For that reason, the district court's order fails to qualify as "effectively unreviewable on appeal from a final judgment," *Midland Asphalt Corp.*, 489 U.S. at 799, for purposes of the collateral order doctrine.

While the availability of appeal after final judgment precludes treating the district court's order as an immediately-appealable collateral order, the possibility of review after final judgment is not an "*adequate* means to attain the relief [the government] desires" so as to prevent the grant of mandamus. *Cheney*, 542 U.S. at 380 (emphasis added). The district court's rejection of the DPA essentially left the government with three options: renegotiate the agreement; proceed to a trial or plea; or allow the speedy trial clock to run and then appeal the resulting dismissal of charges. Neither of the first two options would permit appellate review of the district

court's rejection of the DPA. As for the third option, allowing the speedy trial clock to run would enable review of the order, but would come with its own attendant risks. If the district court were to dismiss the case with prejudice, and the government were unsuccessful on appeal, the government might be unable to refile charges against an admittedly guilty defendant. If the district court instead were to dismiss the case without prejudice, the government still might be unable to re-indict because of the statute of limitations. The possibility that the government would be left with no remedy against a culpable defendant inflicts an "irreparable injury" that "will go unredressed" without mandamus relief. *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015).

Fokker (but not the government) separately argues that the district court's order amounts to an immediately-appealable denial of an injunction for purposes of 28 U.S.C. § 1292(a)(1), which permits appeal of orders granting or denying injunctions. By rejecting the DPA, Fokker claims, the district court's order had the practical effect of denying injunctive relief. We disagree. To qualify as an injunction, the requested relief must be "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint." *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Industries, Inc.*, 789 F.2d 21, 24 (D.C. Cir. 1986) (internal quotation marks omitted); *see* 16 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3922 (3d ed. 2012). Here, however, if the district court had granted the motion to exclude time and accepted the DPA, its order would not have been enforceable by contempt. Although Fokker could face significant consequences—namely, criminal prosecution—if it were to violate the terms of the DPA, it would not confront *judicial* sanctions. As a result, the district court's refusal to exclude time did not amount to an immediately-appealable

denial of an injunction, leaving the government with no "adequate means to attain the relief [it] desires" apart from mandamus. *Cheney*, 542 U.S. at 380.

## B.

A mandamus petitioner must demonstrate that its right to the writ is "clear and indisputable." *Cheney*, 542 U.S. at 381. For the reasons explained in Part II, we conclude that the district court's decision "constitutes a clear legal error." *Kellogg Brown & Root*, 756 F.3d at 762.

It is true that, at the time of the district court's action, there was no appellate opinion specifically construing the scope of a district court's authority under 18 U.S.C. § 3161(h)(2). But we have never required the existence of a prior opinion addressing the precise factual circumstances or statutory provision at issue in order to find clear error justifying mandamus relief. Indeed, the reason there is no appellate opinion interpreting a district court's authority under § 3161(h)(2) is that, before the decision under review, no district court had denied a motion to exclude time based on a mere disagreement with the prosecution's charging decisions. In fact, as far as we can tell, no district court had denied a motion to exclude time under § 3161(h)(2) for *any* reason. Conversely, numerous decisions of the Supreme Court and this court made clear that courts generally lack authority to second-guess the prosecution's constitutionally rooted exercise of charging discretion. *See, e.g.*, *Wayte*, 470 U.S. at 607-08; *Microsoft*, 56 F.3d at 1460-63; *Ammidown*, 497 F.2d at 621-22. Mandamus serves as a check on that kind of "usurpation of judicial power." *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953).

## C.

Finally, we "must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. In this case, the "totality of the circumstances" warrants granting mandamus. *Kellogg Brown & Root*, 756 F.3d at 762.

The order under review marks the first time a DPA negotiated by the government has been subjected to judicial scrutiny of the prosecution's basic exercise of charging discretion. DPAs have become an increasingly important tool in the government's efforts to hold defendants accountable. They afford prosecutors an intermediate alternative between, on one hand, allowing a defendant to evade responsibility altogether, and, on the other hand, seeking a conviction that the prosecution may believe would be difficult to obtain or would have undesirable collateral consequences for the defendant or innocent third parties. The agreements also give prosecutors the flexibility to structure arrangements that, in their view, best account for the defendant's culpability and yield the most desirable long-term outcomes.

By rejecting a central component of the resolution reached between a number of federal enforcement agencies and the defendant company, the district court's ruling "cannot but have enormous practical consequences for the government's ability to negotiate future settlements," *Microsoft*, 56 F.3d at 1456, and could have "potentially far-reaching consequences" for prosecutors' ability to pursue—and fashion the terms of—DPAs, *Kellogg Brown & Root*, 756 F.3d at 762. The order thus amounts to "an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390. In short, the "novelty of the District Court's . . . ruling, combined with its potentially broad and destabilizing effects in an important area of law," justify granting the government's petition for a

writ of mandamus. *Kellogg Brown & Root*, 756 F.3d at 763 (quoting *Cheney*, 542 U.S. at 381).

IV.

Fokker Services requests that we reassign this case to a different district court judge. But the petition for a writ of mandamus, which was brought by the government, does not request reassignment. Although the party seeking the relief we grant has not asked for reassignment, we briefly consider the issue because appellate courts will on occasion reassign a case sua sponte. *See* 28 U.S.C. §§ 455(a), 2106.

Reassignment is warranted only in the "exceedingly rare circumstance," *Kellogg Brown & Root*, 756 F.3d at 763, in which the district judge's conduct is "so extreme as to display clear inability to render fair judgment," *Liteky v. United States*, 510 U.S. 540, 551 (1994). This case does not approach that high bar. Although the district court volunteered opinions about Fokker's conduct on the basis of facts presented during the proceedings, those sorts of "candid reflections" concerning the judge's assessment of a defendant's conduct "simply do not establish bias or prejudice." *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991); *see SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1222 (D.C. Cir. 1989). Nor do the district court's observations suggest "deep-seated . . . antagonism that would make fair judgment impossible." *Liteky*, 540 U.S. at 555. We see no reason to doubt the district court's ability to render fair judgment going forward. We therefore decline to reassign the case.

\* \* \* \* \*

For the foregoing reasons, we vacate the district court's order and remand for further proceedings consistent with this opinion.