# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued August 11, 2020        Decided August 31, 2020

No. 20-5143

IN RE: MICHAEL T. FLYNN,
PETITIONER

On Emergency Petition for Writ of Mandamus

*Sidney Powell* argued the cause for petitioner Michael T. Flynn. With her on the opposition to the petition for rehearing en banc were *Molly McCann* and *Jesse R. Binnall.*

*Jeffrey B. Wall*, Acting Solicitor General, U.S. Department of Justice, argued the cause for United States of America. With him on the response to the petition for rehearing en banc were *Brian C. Rabbitt*, Acting Assistant Attorney General, *Hashim M. Mooppan*, Counselor to the Solicitor General, *Eric J. Feigin*, Deputy Solicitor General, *Frederick Liu,* Assistant to the Solicitor General, *Kenneth C. Kohl*, Acting Principal Assistant U.S. Attorney, and *Jocelyn Ballantine*, Assistant U.S. Attorney.

*Beth A. Wilkinson* argued the cause for Judge Emmet G. Sullivan. With her on the petition for rehearing en banc were *Kosta S. Stojilkovic* and *Rakesh N. Kilaru*.

Before: SRINIVASAN, *Chief Judge*, and HENDERSON, ROGERS, TATEL, GARLAND, GRIFFITH, MILLETT, PILLARD, WILKINS, KATSAS* and RAO, *Circuit Judges*.

* Circuit Judge Katsas did not participate in this matter.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON, with whom *Circuit Judge* RAO joins.

Dissenting opinion filed by *Circuit Judge* RAO, with whom *Circuit Judge* HENDERSON joins.

## I.

PER CURIAM:   In December 2017, Michael T. Flynn ("Petitioner") pleaded guilty to making false statements to FBI agents in violation of 18 U.S.C. § 1001. *See* Transcript of Proceedings at 7:22–13:15, *United States v. Flynn*, No. 1:17-cr-232, ECF No. 103 (D.D.C. Dec. 18, 2018); Transcript of Proceedings at 16:1–15, *Flynn*, No 1:17-cr-232, ECF No. 16 (D.D.C. Jan. 16, 2018); Plea Agreement, *Flynn*, No. 1:17-cr-232, ECF No. 3 (D.D.C. Dec. 1, 2017). In May 2020, before sentencing, the Government moved to dismiss all charges with prejudice, under Federal Rule of Criminal Procedure 48(a). Gov't Mot. Dismiss Crim. Info., *Flynn*, No. 1:17-cr-232, ECF No. 198 (D.D.C. May 7, 2020). Petitioner moved to withdraw his pending motions, including a motion to withdraw his guilty plea, Flynn's Mot. Withdraw Pending Mots., *Flynn*, No. 1:17-cr-232, ECF No. 199 (D.D.C. May 7, 2020), and he consented

to the Government's motion to dismiss, Notice of Consent Gov't Mot. Dismiss, *Flynn*, No. 1:17-cr-232, ECF No. 202 (D.D.C. May 12, 2020).

On May 13, the District Court appointed an *amicus curiae* "to present arguments in opposition to the government's Motion to Dismiss," and to "address whether the Court should issue an Order to Show Cause why [Petitioner] should not be held in criminal contempt for perjury." Order Appointing *Amicus Curiae* at 1, *Flynn*, No. 1:17-cr-232, ECF No. 205 (D.D.C. May 13, 2020). On May 19, the District Court set a briefing schedule and scheduled argument on the Government's motion to dismiss, adding that the order was "subject to a motion for reconsideration, for good cause shown." Minute Order, *Flynn*, No. 1:17-cr-232 (D.D.C. May 19, 2020).

On the same day, Petitioner filed an Emergency Petition for a Writ of Mandamus in this Court, seeking expedited review. The Government did not file a petition for mandamus, but it has generally supported Petitioner's separation-of-powers arguments for mandamus relief. Petitioner sought to compel the District Court "immediately to (1) grant the Justice Department's Motion to Dismiss; (2) vacate its order appointing *amicus curiae*; and (3) reassign the case to another district judge as to any further proceedings." Pet. 2. A three-judge panel of this Court ordered the District Judge to submit a brief in response to the Petition. Order, *In re: Michael T. Flynn*, No. 20-5143 (D.C. Cir. May 21, 2020) (per curiam). The panel heard oral argument and granted the Petition in part, issuing the writ to compel the District Court to immediately grant the Government's motion. Panel Maj. Op. 19; *Per Curiam* Order. The panel majority declined to mandate that the case be reassigned to a different district judge, Panel Maj. Op. 11–12, and, in light of its grant of the writ to compel immediate

dismissal of the charges, the panel majority vacated the appointment of *amicus* as moot, *id.* at 19. One member of the panel dissented from the grant of the writ and the mootness holding. *See generally* Panel Dissenting Op.

Following the issuance of the panel opinions but before the order became effective, *see* D.C. CIR. R. 41(a)(3), the District Judge made a filing in this Court entitled "Petition for Rehearing En Banc," to which Petitioner and the Government each filed a response. An active member of the Court also made a *sua sponte* suggestion that the case be reheard *en banc*. *See* D.C. CIRCUIT HANDBOOK OF PRACTICE AND INTERNAL PROCEDURES 60 (2019) ("[A]ny active judge of the Court, or member of the panel, may suggest that a case be reheard *en banc*."). A vote was called, and a majority of those judges eligible to vote elected to rehear the case *en banc*; the *Per Curiam* Order was consequently vacated, and the *en banc* Court considered the parties' filings and heard argument. Because this Court granted *en banc* review based on the suggestion of a member of this Court to do so *sua sponte*,[1] we need not resolve the question of whether the District Judge— who is not formally a respondent under Federal Rule of

---

[1] The dissent makes much of the fact that we "consider[ed]" the District Judge's petition, see Henderson Dissenting Op. 2, even though we generally consider all pleadings filed in a case. Nonetheless, we granted rehearing based on a suggestion of a member of the court, as reflected by the fact that our order granted rehearing *en banc* without stating that we "granted the petition." When we grant a rehearing petition, we say so. *E.g.*, *United States House of Representatives v. Mnuchin*, No. 19-5176, 2020 WL 1228477, at *1 (D.C. Cir. Mar. 13, 2020) ("ORDERED that the petition for rehearing en banc filed in *McGahn*, No. 19-5331, be granted . . . ."); *al Bahlul v. United States*, No. 11-1324, Doc# 1575020 (D.C. Cir. Sept. 25, 2015) ("ORDERED that the petition be granted. This case will be reheard by the court sitting en banc.").

Appellate Procedure 21—is nevertheless a "party" who may petition for rehearing *en banc* pursuant to Federal Rule of Appellate Procedure 35(b). *See In re Bos.'s Children First*, 244 F.3d 164, 171 (1st Cir. 2001).[2] For the same reason, there is also no Article III problem in the *en banc* proceeding, as the Government acknowledged at oral argument. Oral Arg. Transcript at 61:23–25, 62:1–14.

As to Petitioner's first two requests—to compel the immediate grant of the Government's motion, and to vacate the District Court's appointment of *amicus*—Petitioner has not established that he has "no other adequate means to attain the relief he desires." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976)). We also decline to mandate that the case be reassigned to a different district judge, because Petitioner has not established a clear and indisputable right to reassignment. *See id.* at 381. We therefore deny the Petition.

## II.

A petition for a writ of mandamus "may never be employed as a substitute for appeal." *Will v. United States*, 389 U.S. 90, 97 (1967); *see also Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943) ("[Mandamus] may not appropriately be used merely as a substitute for the appeal procedure prescribed by the statute."). The writ is a "potent weapon[]," "a drastic and extraordinary remedy reserved for really

---

[2] We also hold that the case is not moot. While the Government has filed a motion to dismiss and Petitioner (defendant below) consents, there remains a case or controversy unless and until that motion is granted by the District Court. *Cf. Rinaldi v. United States*, 434 U.S. 22, 31–32 (1977) (per curiam) (reviewing a district court's denial of an unopposed Rule 48(a) motion).

extraordinary causes." *Cheney*, 542 U.S. at 380 (citations and internal quotation marks omitted). "[T]he writ cannot be used 'to actually control the decision of the trial court,'" *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 245 (1964) (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953)), because "[a]s an appellate court, we are a court of review, not of first view," *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005)).

Under governing law, the writ of mandamus should issue only if: (1) "the party seeking issuance of the writ [has] no other adequate means to attain the relief he desires"; (2) "the petitioner [satisfies] the burden of showing that his right to issuance of the writ is clear and indisputable"; and (3) "the issuing court, in the exercise of its discretion, [is] satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 380–81 (citations, alterations, and internal quotation marks omitted). All three requirements must be satisfied, and the absence of any one compels denial of the writ. "As this case implicates the separation of powers, the Court of Appeals must also ask, as part of this inquiry, whether the District Court's actions constituted an unwarranted impairment of another branch in the performance of its constitutional duties." *Cheney*, 542 U.S. at 390.

**A**.

We first address Petitioner's request to compel the District Court to grant the Government's Rule 48(a) motion and vacate the appointment of *amicus.* We conclude that mandamus is unavailable because an "adequate alternative remedy exists." *In re al-Nashiri*, 791 F.3d 71, 78 (D.C. Cir. 2015) (quoting *Barnhart v. Devine*, 771 F.2d 1515, 1524 (D.C. Cir. 1985)).

Issuing the writ is "inappropriate in the presence of an obvious means of review." *Id.*

Here, Petitioner and the Government have an adequate alternate means of relief with respect to both the Rule 48(a) motion and the appointment of *amicus*: the District Court could grant the motion, reject *amicus*'s arguments, and dismiss the case. At oral argument, the District Judge's Attorney effectively represented that all these things may happen. *See* Oral Arg. Transcript at 122:24–25, 123:1–9. Even if the District Court were to deny the motion, there would still be an adequate alternate means of review perhaps via the collateral-order doctrine or a fresh petition for mandamus challenging the denial, *see United States v. Fokker Servs. B.V.*, 818 F.3d 733, 748–49 (D.C. Cir. 2016); *United States v. Dupris*, 664 F.2d 169, 173–74 (8th Cir. 1981), and certainly on direct appeal by Petitioner following sentencing (at which point he could raise *amicus*'s appointment as error), *see* 28 U.S.C. § 1291. Petitioner has not cited any case in which our Court, or any court, issued the writ to compel a district court to decide an *undecided* motion *in a particular way*—i.e., when the district court might yet decide the motion in that way on its own. Indeed, in *Platt*, the Supreme Court took the opposite course, vacating a writ of mandamus as improper where, after the district court denied a motion, the court of appeals undertook its own *de novo* examination and issued the writ to grant the motion instead of remanding the motion to the district court for reconsideration. 376 U.S. at 245–46. The interest in allowing the District Court to decide a pending motion in the first instance is especially pronounced here, given that neither Petitioner nor the Government raised an objection in the District Court to the appointment of the *amicus* or more generally to the course of proceedings for resolving the Rule 48(a) motion.

When ordinary appellate review (or even, as here, further proceedings before the District Court) remains available, the writ may not issue unless the petitioner "identif[ies] some 'irreparable' injury that will go unredressed if he does not secure mandamus relief." *In re al-Nashiri*, 791 F.3d at 79 (citations omitted). Petitioner has failed to do so. To be sure, Petitioner asserts that the continuation of the proceedings below would work a number of hardships on him. *See* Pet'r's Reply 18–19 (citing the continuation of "weekly reporting requirements," the fact that Petitioner's passport and other property are in federal custody, his inability to travel abroad or "be in the presence of a firearm," his incurrence of attorneys' fees, "the stress and anxiety of further criminal prosecution," and "continuing ignominy"). "But it is established that the extraordinary writs cannot be used as substitutes for appeals, even though hardship may result from delay and perhaps unnecessary trial." *Bankers*, 346 U.S. at 383 (citations omitted). While we recognize the gravity of the burdens imposed on criminal defendants, those burdens, without more, generally do not suffice to bring a case within mandamus's ambit. *See In re al-Nashiri*, 791 F.3d at 80 (noting "the bedrock principle of mandamus jurisprudence that the burdens of litigation are normally not a sufficient basis for issuing the writ"); *Roche*, 319 U.S. at 30 (observing that the "inconvenience" of a "trial . . . of several months' duration" and its corresponding costs "is one which we must take it Congress contemplated in providing that only final judgments should be reviewable" in criminal cases). And here, it bears noting, Petitioner is not in confinement pending resolution of the proceedings in the District Court.[3]

---

[3] Nor did Petitioner independently challenge before the District Court or this Court the District Court's orders or their timing on due process grounds as a clearly unwarranted deprivation of liberty.

In the absence of any extraordinary harm to Petitioner that would result from waiting to seek our review (if necessary) after the District Court decides the motion in the ordinary course, the writ cannot issue, either to compel the immediate grant of the Government's motion or to vacate the order appointing *amicus*. *Roche*, 319 U.S. at 30 ("Where the appeal statutes establish the conditions of appellate review an appellate court cannot rightly exercise its discretion to issue a writ whose only effect would be to avoid those conditions and thwart the Congressional policy against piecemeal appeals in criminal cases.").

Nor can we conclude that the Government will suffer any irreparable injury without mandamus. The panel majority—while acknowledging that the Government had not petitioned for the writ, Panel Maj. Op. 17—centered its *Cheney* prong-one analysis entirely on the harms that would befall the Government in the absence of mandamus, *see, e.g.*, *id.* at 8 ("[T]he district court's actions will result in specific harms to . . . the Executive Branch[] . . . . that cannot be remedied on appeal."). The dissent takes the same tack. Rao Dissenting Op. 9–21. We need not decide the propriety of considering the Government's harms as opposed to the Petitioner's, because it is simply not the case that the Executive will be irreparably harmed by the procedures ordered by the District Court such that mandamus should issue to forestall them. Petitioner and the Government argue that appointing an *amicus* and scheduling argument violate the separation of powers, relying on language from *Fokker*. *See, e.g.*, Gov't Br. at 24 ("Because this case involves 'the prosecution's constitutionally rooted exercise of charging discretion,' it is a 'usurpation of judicial power' to second-guess it." (quoting *Fokker*, 818 F.3d at 750)). In *Fokker*, we reviewed the district court's denial of a deferred prosecution agreement sought by the government. 818 F.3d at 737–38. We concluded this denial violated the separation of

powers by intruding on the Executive Branch's prosecutorial discretion. *Id.* Even assuming denial of the Government's Rule 48(a) motion would raise the same separation-of-powers issues, the procedural posture of this case is quite different. *Fokker* dealt with the separation-of-powers harms that followed the denial of the government's motion. This case raises a different set of alleged separation-of-powers harms from the still-unfolding process of deciding the Government's motion. And at this stage, those harms are speculative, especially when the arguments advanced here against that process were not first presented to the District Court by Petitioner or the Government.

Quite simply, the only separation-of-powers question we must answer at this juncture is whether the appointment of an *amicus* and the scheduling of briefing and argument is a clearly, indisputably impermissible intrusion upon Executive authority, because that is all that the District Judge has ordered at this point. We have no trouble answering that question in the negative, because precedent and experience have recognized the authority of courts to appoint an *amicus* to assist their decision-making in similar circumstances, including in criminal cases and even when the movant is the government. *See*, *e.g.*, *Dickerson v. United States*, 530 U.S. 428, 441 n.7 (2000) ("Because no party to the underlying litigation argued in favor of § 3501's constitutionality in this Court, we invited Professor Paul Cassell to assist our deliberations by arguing in support of the judgment below."); *Pepper v. United States*, 562 U.S. 476, 487 (2011) ("Because the United States has confessed error in the Court of Appeals' ruling on the first question, we appointed an *amicus curiae* to defend the Court of Appeals' judgment."). The dissent seeks to debate the metes and bounds of separation of powers depending upon how the hearing might actually unfold, but "[a] fundamental and longstanding principle of judicial restraint requires that courts

avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).

The Government raised concerns that the District Court might institute "intrusive judicial proceedings and criminal charges—and potentially even evidentiary proceedings if the court-appointed amicus has his way." Gov't Br. at 33–34. Petitioner, likewise, argued that the District Judge might "usurp[] the power of the Attorney General to bring additional charges." Pet'r's Reply at 18. But those harms are speculative and may never come to pass. As the District Judge's Attorney noted at oral argument, *amicus* does not seek discovery or an evidentiary hearing.[4] The District Judge's Attorney also noted that the District Judge has not determined what questions, if any, he may have after reviewing the briefs.[5] Regardless of the exact form the proceedings take below, these developments underscore the point that a petition for mandamus filed in anticipation of a district court argument is almost invariably premature. *Fowler v. Butts*, 829 F.3d 788, 793 (7th Cir. 2016)

---

[4] At oral argument, the District Judge's Attorney stated that *amicus*, "in his pleadings suggested there might be a basis for [discovery and fact development]. But when he filed his pleading [in the District Court], he said he's not requesting any fact-finding. So [the District Judge] surely has not entertained any of those issues, and even [*amicus*] in his pleading has said that won't be required. So there's nowhere, again, anywhere in the record that suggests that that would be anything that [the District Judge] intends to do at a hearing." Oral Arg. Transcript at 133:17–24.

[5] The District Judge's Attorney stated: "I can't tell you exactly what won't be pursued, again, because the briefing is not completed, and [the District Judge] hasn't decided all of the questions. He may or may not ask. And even during the oral argument, that could address a question that he has, and there may be no questions." Oral Arg. Transcript at 134:8–13.

("Factual or legal uncertainty means no mandamus."). This is not a circumstance in which the District Court has appointed a court monitor with "wide-ranging extrajudicial duties over the Government's objection," *Cobell v. Norton*, 334 F.3d 1128, 1142 (D.C. Cir. 2003), ordered presidential appointees to appear and testify under oath, *see Matter of Commodity Futures Trading Comm'n*, 941 F.3d 869, 871–73 (7th Cir. 2019), or approved discovery requests in a civil proceeding that included the Vice President and "those in closest operational" and advisory "proximity to the President," "ask[ing] for everything under the sky," *see Cheney*, 542 U.S. at 381, 383, 387. Rather, the District Court has indicated through its actions an intention simply to consider the Government's motion in the ordinary course, to which end it has appointed *amicus* to ensure adverse presentation of the issues. *See Penson v. Ohio*, 488 U.S. 75, 84 (1988) ("The paramount importance of vigorous representation follows from the nature of our adversarial system of justice. This system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful statements on both sides of the question.'" (internal quotation marks omitted) (quoting Kaufman, *Does the Judge Have a Right to Qualified Counsel?*, 61 A.B.A. J. 569, 569 (1975))).

Nothing in this decision forecloses the possibility of future mandamus relief should the District Court's disposition of the motion to dismiss or other order violate the separation of powers or some other clear and indisputable right. We need not and do not now pass on the issues that might be presented by such a mandamus petition; it suffices that no such petition is before us, and that the ability to seek mandamus at the appropriate time (if necessary) provides "[an]other adequate means to attain the relief," *Cheney*, 542 U.S. at 380 (quoting *Kerr*, 426 U.S. at 403), such that the writ may not issue now. Try as they might, neither Petitioner, nor the Government, nor

the dissent has identified a single instance where any court of appeals has granted the writ to decide a trial court motion without first giving the district court an opportunity to make a decision—especially where the objections raised on mandamus were never raised to the district court. We are aware of none.

The dissent suggests that our approach here is inconsistent with *In re Hillary Rodham Clinton & Cheryl Mills*, No. 20-5056 (D.C. Cir. Aug 14, 2020), ignoring the fact that we denied the writ as to petitioner Mills because she had an adequate alternative means to seek relief, *id*. at 8–10, the same reason we deny it here. We granted the writ as to Clinton, the other petitioner, because, unlike here, she did not have an adequate alternative remedy under our precedent, *id*. at 7–8 (citing *In re Kellogg Brown & Root, Inc*., 756 F.3d 754, 761 (D.C. Cir. 2014)), and because, unlike here, the district court had actually ruled on the motion at issue. (And, of course, we found that the ruling was a clear abuse of discretion under our precedent, *id*. at 10–18.)

In sum, as to Petitioner's request that we mandate the immediate grant of the Government's motion and vacate the District Court's order appointing *amicus*, the failure of the Petition to meet *Cheney*'s first prong compels us to deny it.

**B.**

We also decline to mandate the reassignment of this case to a different district judge, *see* Pet. 2, though here the Petition stalls at *Cheney*'s second prong. Our precedent is clear that, because "the injury suffered by a party required to complete judicial proceedings overseen by [a disqualified judicial] officer is by its nature irreparable," mandamus is an appropriate avenue for seeking compelled recusal "where the party seeking

the writ demonstrates a clear and indisputable right to relief." *Cobell*, 334 F.3d at 1139; *see also Berger v. United States*, 255 U.S. 22, 36 (1921) ("The remedy by appeal is inadequate. . . . [I]f prejudice exist[s], it has worked its evil . . . ."). But this Court "will reassign a case only in the exceedingly rare circumstance that a district judge's conduct is 'so extreme as to display clear inability to render fair judgment.'" *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 763 (D.C. Cir. 2014) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *see also id.* (referring to this as a "very high standard").

Petitioner points to the District Judge's failure to grant the Government's motion, his appointment of *amicus*, and his plan for a briefing schedule that addressed potential submissions by other *amici* as "bespeak[ing] a judge who is . . . biased against Petitioner." Pet. 32. But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555 (indicating that rulings warranting recusal occur "only in the rarest circumstances"); *see also Rafferty v. NYNEX Corp.*, 60 F.3d 844, 848 (D.C. Cir. 1995) (per curiam) ("Rafferty offers no evidence that the judge had a conflict of interest or was biased; he merely *infers* bias from unfavorable judicial rulings and from court delays in ruling on pending motions."). Petitioner's inferences aside, none of the District Judge's actions cited by Petitioner comes close to meeting the "very high standard" of "conduct . . . so extreme as to display clear inability to render fair judgment." *In re Kellogg Brown & Root, Inc.*, 756 F.3d at 763 (citation and internal quotation marks omitted).

Petitioner also argues that several of the District Judge's statements evidence the District Judge's "outrage" and "deep-seated antagonism," warranting reassignment. Pet. 33; *see* App. 34:13–18 ("Arguably, you sold your country out. The Court's going to consider all of that. . . . [Y]ou could be

15

incarcerated."); *id.* at 34:19–23 ("It could be that any sentence of incarceration imposed after your further cooperation . . . would be for less time than a sentence may be today. I can't make any guarantees, but I'm not hiding my disgust, my disdain for this criminal offense."); *id.* at 37:9–10 ("Hypothetically, could he have been charged with treason?"); *id.* at 41:16–23 ("I was just trying to determine the benefit of and the generosity of the government in bestowing a benefit on Mr. Flynn. . . . I'm not suggesting he committed treason."). The quoted statements were made at a scheduled sentencing proceeding at which the Judge first inquired whether Petitioner adhered to his guilty plea (he did), App. at 17:1–7, and then urged Petitioner to reconsider whether he wished to proceed that day with the scheduled sentencing or wait until he completed his cooperation (he chose to postpone), *id.* at 45:11–25, 49:2–12. We agree with the panel majority, Panel Maj. Op. 11, that none of the statements to which Petitioner points establishes that reassignment is warranted.[6]

"[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of . . . proceedings[] do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555; *see also Fokker*, 818 F.3d at 751 (holding reassignment unwarranted where "the district court volunteered opinions about Fokker's conduct on the basis of facts presented during the proceedings"). Here, the District Judge was not simply holding forth on his opinions; rather,

---

[6] The dissent now suggests that "a pattern of conduct" beginning "early on in this case" raises "serious concerns" about impartiality, Henderson Dissent Op. 4, but the only cited conduct that was not also in front of the panel is the District Judge's decision to seek *en banc* review before the panel's order became effective—an action that, as we explain, cannot on its own support a different result now.

each of the statements to which Petitioner objects was plainly made in the course of formal judicial proceedings over which he presided—not in some other context.  On these facts, we cannot find that Petitioner's right to relief is "clear and indisputable."  *Cheney*, 542 U.S. at 381 (quoting *Kerr*, 426 U.S. at 403).  We therefore deny the Petition insofar as it seeks an order reassigning the underlying case to a different district judge.

Likewise, there is no basis for disqualifying the District Judge under 28 U.S.C. § 455(b)(5)(i), because the District Judge has not become a party to the proceeding below. "'[P]roceeding' includes pretrial, trial, appellate review, or other stages of litigation," 28 U.S.C. § 455(d)(1)—but, contrary to the contention of the dissent, Henderson Dissenting Op. 1–2, a petition for a writ of mandamus is a separate action. *See, e.g.*, *Fed. Ins. Co. v. United States*, 882 F.3d 348, 362 (2d Cir. 2018) ("[M]andamus is not an appeal . . . ."); *In re Arunachalam*, 812 F.3d 290, 293 (3d Cir. 2016) (same); *Skil Corp. v. Millers Falls Co.*, 541 F.2d 554, 558 (6th Cir. 1976) ("A proceeding upon a petition for a writ of mandamus is a separate action, not an appeal . . . .").  Federal Rule of Appellate Procedure 21 contemplates that a district judge has a proper role, upon invitation or order of the Court of Appeals (as occurred here), in addressing a mandamus petition.  *See* FED. R. APP. P. 21(b)(4).  In sum, the participation of the District Judge in the mandamus proceeding has not (and could not, as a matter of law) transform him into a "party" in the separate underlying criminal case.

Nor does participating in a mandamus proceeding create an appearance of partiality warranting recusal from the separate, underlying action.  *See* 28 U.S.C. § 455(a).  If that were the case, then every mandamus petitioner seeking a district judge's recusal would, if responded to by the district

judge, obtain the sought-after recusal—a result that would not only swallow the dictates of § 455, but would run up against caselaw to the contrary. *See, e.g.*, *In re Moore*, 955 F.3d 384, 388 (4th Cir. 2020) (denying mandamus petition seeking district judge's recusal, where district judge addressed petition at Court of Appeals' invitation); Panel Maj. Op. 11–12 (declining to mandate reassignment of case despite district judge's participation on mandamus); *cf. Fokker*, 818 F.3d at 750–51 (where district judge was represented in mandamus action by *amicus*, declining to reassign case *sua sponte*).[7]

Finally, filing a petition for rehearing *en banc* does not suggest a level of partiality justifying reassignment in this case. As explained, the District Judge participated in the mandamus proceeding at this Court's invitation, and nothing about that participation created a reasonable impression of partiality, nor could it. Having come that far, the further step of filing a petition for rehearing did not, on its own, create a reasonable impression of partiality, especially as nothing in the *en banc* petition itself indicates bias in connection with the underlying criminal case. Indeed, any views the District Judge has conveyed in his briefing before us come from what he has learned in carrying out his judicial responsibilities. *Liteky*, 510 U.S. at 555; *Fokker*, 818 F.3d at 751.

## III.

For the foregoing reasons, the Petition for a writ of mandamus is denied. As the underlying criminal case resumes

---

[7] While mandamus is "an appropriate vehicle for seeking recusal of a judicial officer during the pendency of a case," *In re al-Nashiri*, 921 F.3d 224, 233 (D.C. Cir. 2019) (quoting *In re Mohammad*, 866 F.3d 473, 475 (D.C. Cir. 2017)), § 455(a) claims can also be raised on direct appeal, *see Fowler*, 829 F.3d at 791.

in the District Court, we trust and expect the District Court to proceed with appropriate dispatch.

*So ordered.*

GRIFFITH, *Circuit Judge*, concurring: In cases that attract public attention, it is common for pundits and politicians to frame their commentary in a way that reduces the judicial process to little more than a skirmish in a partisan battle. The party affiliation of the President who appoints a judge becomes an explanation for the judge's real reason for the disposition, and the legal reasoning employed is seen as a cover for the exercise of raw political power. No doubt there will be some who will describe the court's decision today in such terms, but they would be mistaken.

This proceeding is not about the merits of the prosecution of General Flynn or the Government's decision to abandon that prosecution. Rather, this proceeding involves questions about the structure of the Judiciary and its relationship to the Executive Branch. There are two central problems in this case: defining the scope of the authority of the Judiciary to inquire into the exercise of a core function of the Executive and deciding how the relationship between the district court and our court shapes a challenge to that inquiry. Those questions are far removed from the partisan skirmishes of the day. The resolution of those questions in this case involves nothing more and nothing less than the application of neutral principles about which reasonable jurists on this court disagree. *See* Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 IND. L.J. 1 (1971). And that principled disagreement revisits a long-running debate about the relative powers of the Executive and Judicial Branches. Today we reach the unexceptional yet important conclusion that a court of appeals should stay its hand and allow the district court to finish its work rather than hear a challenge to a decision not yet made. That is a policy the federal courts have followed since the beginning of the Republic, *see* Judiciary Act of 1789, ch. 20, § 22, 1 Stat. 73, 84; 28 U.S.C. § 1291, and we are aware of no case in which a court of appeals has ordered a district judge to decide a *pending* motion in a particular way.

Moreover, as its counsel repeatedly stated at oral argument, the district court may well grant the Government's motion to dismiss the case against General Flynn. In fact, it would be highly unusual if it did not, given the Executive's constitutional prerogative to direct and control prosecutions and the district court's limited discretion under Rule 48(a), especially when the defendant supports the Government's motion. But if the court denies the motion, General Flynn has multiple avenues of relief that he can pursue. And because he does, mandamus is not appropriate in this case at this time.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, with whom RAO, *Circuit Judge*, joins, dissenting: The Court today denies Michael Flynn's mandamus petition on the ground that he has an adequate remedy at law. It also declines to reassign this case to a different trial judge. I dissent as to the majority's merits holding for the reasons stated in the majority opinion in *In re Flynn*, 961 F.3d 1215, 1219 (D.C. Cir. 2020), *vacated, reh'g en banc granted* No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020); further, I join Judge Rao's dissent herein. As to the majority's decision not to reassign, my colleagues set an impossibly high bar for a trial judge's impartiality to "reasonably be questioned," 28 U.S.C. § 455(a), and seem content to read that subsection out of the United States Code, even as they infuse Rule 48(a)'s "with leave of court" clause with enough force to upend our entire system of separated powers. Because I believe the trial judge's conduct patently draws his impartiality into question—and because I believe § 455(a) has teeth—I dissent and write separately to explain why the trial judge is disqualified from further participation in this case.

When a party petitions for mandamus relief pursuant to Federal Rule of Appellate Procedure 21, as Michael Flynn did, that Rule provides—in careful detail—that the trial judge who is the subject of the requested relief can participate *only* to the extent we authorize him to do so. *See* FED. R. APP. P. 21(b)(4). The three-judge panel did authorize the trial judge to participate by directing him to "file a response addressing petitioner's request that this court order [him] to grant the government's motion to dismiss." Order, *In re Flynn*, No. 20-5143 (D.C. Cir. May 21, 2020) (per curiam). He can gain no greater role when, dissatisfied with the grant of the writ, he seeks en banc review.

Federal Rule of Appellate Procedure 35, which sets out the en banc review procedure, authorizes only a "party" to seek en banc review. FED. R. APP. P. 35(b). The trial judge to whom

the writ is directed is not a party within the meaning of Rule 35;[1] if he were, 28 U.S.C. § 455(b)(5)(i) would require his disqualification from further participation in the case. *Id.* (trial judge "shall . . . disqualify himself . . . [if] [h]e . . . [i]s a party to the proceeding").[2] Notwithstanding the July 30 order granting en banc review recites "[u]pon consideration of the petition for rehearing en banc," Order, *In re Flynn*, No. 20-5143, 2020 WL 4355389, at *1 (D.C. Cir. July 30, 2020), my colleagues in the majority now recognize their error and vacate the writ "based on the suggestion of a member of this Court to do so *sua sponte*," Majority Op. 4.[3]

---

[1] Indeed, I am aware of no case holding that a trial judge may petition for en banc review under Rule 35; and at least one circuit has expressly questioned the trial judge's ability to do so. *See In re Bos.'s Children First*, 244 F.3d 164, 171 (1st Cir. 2001) ("basis" for trial judge to petition for rehearing en banc "may be open to dispute" based on FED. R. APP. P. 21(b)(4)); *cf. Ligon v. City of New York*, 736 F.3d 166, 171 (2d Cir. 2013) (per curiam) (rejecting trial judge's attempt to challenge reassignment because, in part, "[a] district judge has no legal interest in a case or its outcome").

[2] Section 455(d)(1) defines "proceeding" to include "pretrial, trial, appellate review, or other stages of litigation."

[3] The majority facilely replies that we "generally *consider* all pleadings filed in a case." Majority Op. 4 n.1 (emphasis added). I should hope so. But when "consideration" is the sole basis in the whereas clause of an order that is issued in only one of two ways, it carries determinative weight. Moreover, when we grant en banc review *sua sponte*, we also say so. *See, e.g.*, Order, *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. May 16, 2016) (en banc) (per curiam); Order, *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc) (per curiam) (No. 13-5281), 2014 WL 2619836, at *1; *United States v. Microsoft Corp.*, 213 F.3d 764 (D.C. Cir. 2000) (en banc) (per curiam); *Kiser v. Boyle*, 517 F.2d 1274 (D.C. Cir. 1974) (en banc) (per curiam). In any event, the point is that the court should always accurately specify the basis for its action in order to

Nonetheless, the trial judge's unsuccessful invocation of Rule 35 *statutorily* disqualifies him under § 455(a) from any further participation—especially regarding the government's pending motion to dismiss—in this case. *Id.* ("Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."); *see also* Code of Conduct for United States Judges, Canon 3(C)(1) (same). Although many of his statements throughout this case have been less than proper, as the panel observed in the vacated panel opinion, those statements alone "did not indicate a clear inability to decide this case fairly" inasmuch as all that was required on remand was "simply to grant the government's Rule 48(a) motion to dismiss." *In re Flynn*, 961 F.3d at 1223. But his petition for en banc review with no legal support whatsoever therefor manifests, first, that he plainly appears to view himself as a "party"; second, and more important, that his attempted action removes any doubt that the appearance of impartiality required of all federal judges has been compromised beyond repair.

The "standard for disqualification under § 455(a) is . . . objective" and "[t]he question is whether a reasonable and informed observer would question the judge's impartiality." *United States v. Microsoft Corp.*, 253 F.3d 34, 114 (D.C. Cir. 2001) (en banc) (per curiam). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible," *id.* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)), because "[d]eference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges." *In re Al-Nashiri*, 921 F.3d 224, 234

discharge its obligation to give full and fair notice both to the parties and to the public.

(D.C. Cir. 2019) (alteration in original) (quoting *Microsoft Corp.*, 253 F.3d at 115). Strict adherence to § 455(a)'s command is required to ensure that every federal judge performs his duties so that "justice . . . satisf[ies] the appearance of justice." *Liljeberg*, 486 U.S. at 864 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Such adherence is all the more vital in a high-profile case like this one, in which public interest is nationwide. *See United States v. Tucker*, 78 F.3d 1313, 1325 (8th Cir. 1996) (reassigning case to different trial judge, in part, "[g]iven the high profile . . . of [the] case in particular"); *In re Bos.'s Children First*, 244 F.3d at 169–70; *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993). "Congress enacted subsection 455(a) precisely because 'people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges,'" and "[i]n high profile cases such as this one . . . , such suspicions are especially likely and untoward." *In re Sch. Asbestos Litig.*, 977 F.2d 764, 781–82 (3d Cir. 1992) (quoting *Liljeberg,* 486 U.S. at 864–65). A judge must proceed with the utmost care, then, to ensure that the parties are treated with the same fairness as those in any other case, that the administration of the case is handled judiciously and expeditiously and that he, at all times, maintains seamless impartiality both in fact and in appearance.

From early on in this case, the trial judge has demonstrated a pattern of conduct that, taken together, raises serious concerns about the appearance of impartiality. *See In re Sch. Asbestos Litig.*, 977 F.2d at 781–82 ("We need not decide whether any of these facts alone would have required disqualification, for . . . we believe that together they create an appearance of partiality that mandates disqualification."); *cf. Cobell v. Kempthorne*, 455 F.3d 317, 335 (D.C. Cir. 2006) (reassignment of trial judge warranted based on "the combination of the content of the [judge's] opinion and the

nature of the district court's actions"). At Flynn's plea hearing, the trial judge asked whether Flynn could be guilty of treason and noted his "disgust" and "disdain" for Flynn's actions. Transcript of Proceedings Held on Dec. 18, 2018 at 33, 36, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. Aug. 20, 2019), ECF No. 103. When, over two years later, the government moved to dismiss the charges against Flynn, the trial judge encouraged the general public to participate as amici, *see* Minute Order, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. May 12, 2020), and appointed an amicus, not to assist the judge with a complex area of law but instead to "present arguments in opposition to the government's Motion to Dismiss," Order Appointing *Amicus Curiae* at 1, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. May 13, 2020), ECF No. 205. And his choice was not just any amicus; the day before his appointment, amicus penned an op-ed in The Washington Post suggesting that the trial judge could—and strongly implying that he should—deny the government's motion. *See* John Gleeson, et al., *The Flynn case isn't over until the judge says it's over*, WASH. POST. (May 11, 2020, 6:52 PM), https://www.washingtonpost.com/opinions/2020/05/11/flynn-case-isnt-over-until-judge-says-its-over/. Then, on Flynn's petitioning for mandamus relief and the panel's ordering the trial judge to address the government's dismissal motion, he retained counsel. Entry of Appearance, *In re Flynn*, No. 20-5143 (D.C. Cir. May 26, 2020) (Beth A. Wilkinson's entry of appearance on behalf of the trial judge). Finally, after the panel ordered him to grant the government's motion, he sought to use a procedure limited to a "party" and petitioned for en banc

review. Petition at 1–2, *In re Flynn*, No. 20-5143 (D.C. Cir. July 9, 2020).[4]

The trial judge's attempted use of Rule 35 is not the first time he has acted as if he were a party. At his option and with the appellate court's approval, Rule 21, as noted earlier, allows the subject judge to participate in a mandamus proceeding either directly or by amicus.[5] But Rule 21 leaves no room for the judge to retain private counsel as was done here. *See* FED. R. APP. P. 21(b)(4). A party, not a judge whose action is under mandamus review, retains private counsel. As the Advisory Committee Notes on Rule 21(b) make clear, "[b]ecause it is ordinarily undesirable to place the trial court judge, even temporarily, in an adversarial posture with a litigant, the rule permits a *court of appeals* to invite an *amicus curiae* to provide a response to the petition." FED. R. APP. P. 21(b) advisory committee's note to 1996 amendment (first emphasis added).

And his earlier *sua sponte* appointment of amicus to oppose the government's motion to dismiss, although apparently allowed, is further indication that he has from the outset appeared to view his role in adjudicating the government's motion to dismiss as one that requires outside support—as if he were *a priori* antagonistic to the relief both

---

[4] The majority takes issue with my characterization of this history as a "pattern of conduct" when the panel had much of the history before it and did not deem it sufficient to disqualify the trial judge for an appearance of partiality. Majority Op. 15 n.6. As we, like all courts, have consistently held, however, it is often a *combination* of facts that creates the prohibited appearance. *See In re Sch. Asbestos Litig.*, 977 F.2d at 781–82. And the trial judge's *ultra vires* Rule 35 petition is the trout in the milk. *See* HENRY D. THOREAU, JOURNAL (Nov. 11, 1850).

[5] Although we could have invited amicus to address Flynn's petition, we directed the trial judge himself to respond.

bona fide parties seek.[6]  Even more telling of apparent partiality, the trial judge ordered amicus to opine on whether Flynn had committed perjury and should be held in criminal contempt.  Order Appointing *Amicus Curiae* at 1, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. May 13, 2020), ECF No. 205.  That direction indicates that, even if compelled to grant the motion to dismiss, the trial judge intends to pursue Flynn on his own.

But it is the trial judge's conduct since the government's May 2020 motion to dismiss, weighed in light of his earlier conduct, that delivers the *coup de grâce* to the last shred of the trial judge's appearance of impartiality.  In other words, if there was any doubt up to this point whether his conduct gives the appearance of partiality, that doubt is gone.  Granted, the panel majority opinion resisted Flynn's request that a different judge be assigned to this case.  *See In re Flynn*, 961 F.3d at 1223.  That decision rested primarily on the fact that Flynn's request centered on the trial judge's in-court statements, which are almost always insufficient on their own to warrant reassignment, and the fact that the trial judge was simply directed to grant the government's motion to dismiss.  *See id.* But the trial judge's "extreme" conduct throughout this case, culminating in his decision to ignore the writ and instead seek en banc review, demonstrates a "clear inability to render fair judgment."  *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 750 (D.C. Cir. 2016) (quoting *Liteky v. United States*, 510 U.S.

---

[6]  In fact, his appointment of amicus predated the panel's May 21st direction to "address" Flynn's mandamus petition.  *See* Order Appointing *Amicus Curiae* at 1, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. May 13, 2020), ECF No. 205.

540, 551 (1994)[7]); s*ee also United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995).

Moreover, sister circuits have not been as nonchalant as my majority colleagues regarding their obligation to ensure that the appearance of impartiality remains inviolable. *See, e.g.*, *United States v. Whitman*, 209 F.3d 619, 625–26 (6th Cir. 2000) (per curiam) (case reassigned on remand because "the district judge's lengthy harangue . . . create[d] the impression that the impartial administration of the law was not his primary concern"); *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 164 (3d Cir. 1993) (mandamus granted and trial judge disqualified because "observations made by [him] throughout the conduct of the[] proceedings could well give rise to the questioning of his impartiality"); *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1977) (case reassigned on remand because trial judge announced defendant was "stuck" before hearing from defense counsel).

Lest we forget, at the center of this case is Michael Flynn—a criminal defendant whom the government no longer seeks to prosecute but who waits in limbo for his case to be resolved. The trial judge has delayed his consideration of the government's unopposed motion to dismiss with little regard for the time Flynn has spent, and continues to spend, under the weight of now-abandoned criminal charges while the trial judge appears to continue the fight to preserve an improper role.[8] Notwithstanding the trial judge's counsel's blasé

---

[7] In *Liteky*, the Supreme Court recognized that *in*-court conduct can disqualify a judge if it "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." 510 U.S. at 556.

[8] The majority's hair-splitting regarding whether the trial judge's invocation of Rule 35 made or did not make him a party in the underlying criminal prosecution is a spectacular red herring.

representation during oral argument, it is intolerable for criminal charges to hang for months over the head of an individual *whom the government no longer wishes to prosecute. See* Transcript of Oral Argument at 145, *In re Flynn*, No. 20-5143 (D.C. Cir. Aug. 11, 2020) (trial judge's counsel's assertion that trial judge taking up to seven weeks to hold hearing and then another month to issue decision in such circumstances as Flynn's "happens all the time in district court").

"Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *In re Al-Nashiri*, 921 F.3d at 233–34. If the trial judge continues to preside over this case, I submit our system is not so worthy because his conduct has undermined the appearance of impartiality. My colleagues in the majority disagree and I am frankly dismayed by their endorsement of the trial judge's conduct, especially after the government's motion to dismiss. Granted, all members of the en banc court weigh that conduct in light of their own experience and notions of impartiality, while, at the same time, applying § 455(a)'s "objective" standard of "a reasonable and informed observer." *Microsoft Corp.*, 253 F.3d at 114. Although, for them, the exact tipping point at which the appearance of impartiality is lost is unknown, I am certain that such a point exists and that the trial judge has passed it. To protect Flynn's rights as a criminal defendant, the government's interest in controlling its prosecution and the integrity of the United States District Court for the District of

---

Majority Op. 16. That my colleagues can find no instance in which a trial judge to whom a writ of mandamus is directed asserts authority to appeal that writ is all that need be said to demonstrate how far afield from the appearance of impartiality he has moved. Would the majority give the same yawn if I petitioned the United States Supreme Court for certiorari review of its opinion herein? Of course not.

Columbia,[9] I believe the trial judge, by his conduct manifesting the appearance of glaring partiality, has disqualified himself. I would order the reassignment of this case to a different trial judge for dismissal.

Accordingly, I respectfully dissent.

---

[9] The trial judge's actions since the government's motion to dismiss was filed set a dangerous precedent. In the future, whenever a writ of mandamus is sought under Rule 21, the subject trial judge will be free to disregard the circumscribed role Rule 21(b)(4) mandates and instead mount an all-out defense of his conduct. I cannot think of an action more inimical to the appearance of an impartial arbiter.

RAO, *Circuit Judge*, with whom HENDERSON, *Circuit Judge*, joins, dissenting: The Department of Justice has moved to dismiss the criminal charges against General Michael Flynn, but the district court insists on further factfinding to scrutinize the motives and circumstances behind the Department's decision. While a district court plays a limited role in granting "leave of court" to an unopposed motion to dismiss, it is long settled that a district court cannot supervise the prosecutorial decisions of the Executive Branch. In our system of separated powers, the government may deprive a person of his liberty only upon the action of all three branches: Congress must pass a law criminalizing the activity; the Executive must determine that prosecution is in the public interest; and the Judiciary, independent of the political branches, must adjudicate the case. The Constitution divides these powers in order to protect individual liberty from a concentration of government authority.

In Flynn's case, the prosecution no longer has a prosecutor. Yet the case continues with district court proceedings aimed at uncovering the internal deliberations of the Department. The majority gestures at the potential harms of such a judicial intrusion into the Executive Branch, but takes a wait-and-see approach, hoping and hinting that the district judge will not take the actions he clearly states he will take. While mandamus remains an extraordinary remedy, it is appropriate here to prevent this judicial usurpation of the executive power and to correct the district court's abuse of discretion. I respectfully dissent.

I.

The majority takes a superficially appealing position that the district court must first decide the government's motion to dismiss before this court may grant a writ of mandamus. In the ordinary course, this is how we proceed. Yet the facts here

demonstrate a series of irregularities by the government and the district court. We reserve the writ of mandamus for extraordinary cases, and the circumstances in Flynn's case are nothing if not extraordinary.

Currently pending before the district court is the government's motion to dismiss the charges against Flynn under Rule 48(a) of the Federal Rules of Criminal Procedure. *See* FED. R. CRIM. P. 48(a) ("The government may, with leave of court, dismiss an indictment, information, or complaint."). The Department of Justice ("DOJ" or "Department") no longer seeks to prosecute Flynn because it has determined that it cannot sustain the charges and that prosecution would not be in the public interest. *See* Gov't Mot. Dismiss Crim. Info., *United States v. Flynn*, No. 17-232, ECF 198, at 2 (D.D.C. May 7, 2020) ("Motion to Dismiss Information"). In confessing its error and mishandling of Flynn's case, the Department details the missteps of prosecutors and the Federal Bureau of Investigation ("FBI"). A summary of the proceedings provides important context for understanding Flynn's petition for a writ of mandamus.

In August 2016, the FBI began investigating Flynn as part of a larger investigation into Donald Trump's presidential campaign and its connections to Russian officials. After four months of investigation, the FBI determined that there was "no derogatory information" related to Flynn and that the investigation into his activities should be closed. *Id.* at 3–4 (internal citations omitted). Before the case was formally closed, however, the FBI learned of phone calls between Flynn and Russian Ambassador Sergey Kislyak that occurred in December 2016—after Flynn was named the incoming National Security Advisor for President-Elect Trump.

Several FBI agents interviewed Flynn in the White House on January 24, 2017. *Id.* at 8. By the time of the interview, the agents already possessed transcripts of the calls and therefore knew exactly what had been communicated. Nonetheless, contrary to the wishes of Acting Attorney General Sally Yates and ordinary FBI practice, the investigators declined to notify the White House of what had been said on the calls before interviewing Flynn. The FBI also failed to notify the Department that it was proceeding with the interview on the day in question. That the investigators were going outside the chain of command was later admitted by FBI Director James Comey, who noted that the FBI would not ordinarily "have done or gotten away with" such conduct. *Id.* at 7. When the agents met with Flynn, they failed to provide him with transcripts of the calls or to warn him that making false statements would be a crime. They also pressured him not to bring his lawyer, telling him that if he wanted anyone else present at the meeting, the FBI would have to elevate the matter and bring it directly to the Department.

Flynn is alleged to have made several false statements during the interview. At the time, however, the FBI agents who questioned him—agents who possessed transcripts of Flynn's conversations with Kislyak—"had the impression … that Flynn was not lying or did not think he was lying." *Id.* at 9. Nonetheless, Special Counsel Robert Mueller filed a criminal information against Flynn months later, charging him with a single count of making false statements under 18 U.S.C. § 1001(a)(2). Flynn pleaded guilty, and his plea was accepted by the district court. A different district judge presided at Flynn's sentencing hearing. During the hearing, the district judge expressed "disgust" and "disdain" for Flynn's actions and commented that Flynn arguably "sold [his] country out." App. 34:13–14; 22–23. The district judge also at one point raised the question of whether Flynn could have been charged

with treason. Later in the hearing, the district judge clarified that he had not intended to "suggest[] [Flynn] committed treason," but simply wanted a better picture of the concessions the government had made in offering Flynn a plea deal. *Id.* at 41:11–23.

The sentencing hearing was continued to permit Flynn to conclude his cooperation with the government in accordance with his plea deal. After retaining new counsel and filing a series of discovery motions, on January 14, 2020, Flynn moved to withdraw his guilty plea for a variety of reasons, including that the government had failed to comply with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963),[1] and that the government had breached the plea agreement by seeking prison time. The motion to withdraw is still pending before the district court.

On May 7, 2020, the Department filed a Rule 48(a) motion to dismiss the charges against Flynn. The government emphasized that Flynn's statements were not material because

---

[1] Flynn based this allegation on, among other things, the December 9, 2019, release of a 400-page Inspector General report and more than 600 pages of additional FBI reports and agent notes allegedly not previously disclosed. Def. Mot. to Withdraw, *Flynn*, No. 1:17-cr-232, ECF No. 151, at 13 (D.D.C. Jan. 14, 2020). In its motion to dismiss, the government admitted that it based its reassessment of the facts and circumstances of Flynn's prosecution in part on the "newly discovered and disclosed information appended to the defendant's supplemental pleadings." Motion to Dismiss Information, at 2, 12 (citing ECF Nos. 181, 188–190). The government also admitted that Flynn pleaded guilty "without full awareness of the circumstances of the newly discovered, disclosed, or declassified information as to the FBI's investigation of him." *Id.* at 19.

by the time of the January 24 interview, the FBI had already concluded there was no legitimate basis to continue investigating him. The transcripts of the phone calls "were entirely appropriate on their face," Motion to Dismiss Information, at 13–14, which, along with the FBI's shifting justifications for his interview, "suggest[ed] that the FBI was eager to interview Mr. Flynn irrespective of any underlying investigation," *id.* at 16. In light of the newly discovered evidence, the government averred that it could not prove beyond a reasonable doubt that Flynn's statements were false. The government concluded that "continued prosecution … does not serve a substantial federal interest." *Id.* at 2. Flynn did not oppose the government's motion.

The district court did not grant the unopposed motion to dismiss. Instead, it "exercise[d] [the court's] inherent authority to appoint The Honorable John Gleeson (Ret.) as *amicus curiae* to present arguments in opposition to the government's Motion to Dismiss."[2] Order Appointing Amicus Curiae, *Flynn*, No.

---

[2] The majority alleges that neither Flynn nor the government objected below to the appointment of Gleeson as an amicus. Maj. Op. 7. While it is true that there were no objections specifically to Gleeson's appointment, Flynn had already raised—the day before Gleeson's appointment—a robust objection to amici generally. A coalition of former prosecutors sought leave to file a brief as amicus curiae, and on May 12, 2020, the district court issued a minute order anticipating further amicus filings and notifying parties of its intent to enter a scheduling order governing such submissions. Flynn objected to the filing of a brief by the former prosecutors, as well as the filing of any amicus briefs by third parties. Flynn Opp'n Mot. to Intent to File, *Flynn*, No. 1:17-cr-232, ECF No. 204, at 5 (D.D.C. May 12, 2020). Flynn maintained that in a criminal case it was inappropriate for a third party to "usurp the role of the government's counsel," and therefore it would violate the separation of powers if

1:17-cr-232, ECF No. 205, at 1 (D.D.C. May 13, 2020). The district court also directed Gleeson to "address whether the Court should issue an Order to Show Cause why Mr. Flynn should not be held in criminal contempt for perjury pursuant to 18 U.S.C. § 401, Federal Rule of Criminal Procedure 42, the Court's inherent authority, and any other applicable statutes, rules, or controlling law." *Id.*

Flynn filed an emergency petition for a writ of mandamus requesting that this court order the district court to immediately: (1) grant the Department's motion to dismiss; (2) vacate Gleeson's appointment as amicus curiae; and (3) reassign the case to a different district judge. Mandamus Pet. 2. The panel ordered a response from the district judge. *See* D.C. Cɪʀ. R. 21(a). In his response, the district judge explained that he sought a hearing and appointment of amicus to "fill the adversarial gap to ensure full consideration of the issues," engage in a "factbound inquiry" about "whether Mr. Flynn should be subject to any sanction" for changing his plea, and "conduct investigations as necessary." Sullivan Response 32–35 (internal quotation marks omitted). The panel also invited the government to respond, which it did in support of mandamus. The panel granted the petition in part and directed the district judge to grant the government's Rule 48(a) motion to dismiss. *In re Flynn*, 961 F.3d 1215, 1227 (D.C. Cir.), *reh'g en banc granted, order vacated*, No. 20-5143, 2020 WL 4355389 (D.C. Cir. July 30, 2020). The panel did not, however, order the case reassigned to a different judge. *Id.* at 1223. The district judge declined to comply with the writ and instead petitioned the en banc court for rehearing, citing Rule 35. The court granted rehearing "[u]pon consideration of the petition

---

the district court allowed a third party to "stand in the place" of the prosecutor. *Id.* at 2.

for rehearing en banc" that the district judge filed through retained counsel. Order, *In re Michael T. Flynn*, No. 20-5143 (D.C. Cir. July 30, 2020).[3]

## II.

Although mandamus is an extraordinary remedy, the writ exists for courts of appeals to prevent "judicial usurpation of

---

[3] As Judge Henderson notes, the district judge's decision to seek rehearing en banc—an action reserved for "[a] party" to a proceeding, *see* FED. R. APP. P. 35(b)—raises several unsettled, threshold questions. *See* Dissenting Op. 1–2 (Henderson, J.). The government specifically questioned whether a district judge is a "party" for the purposes of Rule 35(b); whether a district judge may petition for rehearing in a mandamus case when he was not "invited or ordered to do so by the court of appeals," FED. R. APP. P. 21(b)(4); and whether a district judge may seek rehearing without receiving authorization from the Solicitor General. *See* U.S. Response to En Banc Pet. 15–16. These appear to be questions of first impression, as the parties can identify no example of a district judge successfully seeking rehearing en banc from a writ of mandamus. The majority avoids these questions by now stating that we granted rehearing sua sponte, although the court's order made no reference to acting sua sponte. Dissenting Op. 2–3 & n.3 (Henderson, J.). Moreover, while we have the authority to grant rehearing sua sponte, the action here is inconsistent with this court's established practice, which is to grant rehearing sua sponte only "[i]n the absence of a request from a party." D.C. Circuit Handbook of Practice and Internal Procedures 60 (2019). The majority therefore should have first ascertained whether the district judge is "[a] party" who is entitled to file a petition for rehearing. If he is such a party, the majority should have considered his petition directly, in accordance with our established practice, which would have required addressing the threshold questions identified by the government, rather than sweeping them under the rug. As rehearing en banc was also granted without additional briefing, I do not address these novel questions here.

power, or a clear abuse of discretion," such as an action that "would threaten the separation of powers by embarrassing the executive arm of the Government." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004) (citing *Ex parte Peru*, 318 U.S. 578, 588 (1943)) (cleaned up). We use the writ to prevent future errors by trial courts and to correct judicial excesses that could have far reaching consequences.[4] *See In re Hillary Rodham Clinton & Cheryl Mills*, No. 20-5056, slip. op. at 19 (D.C. Cir. Aug. 14, 2020) (citing, inter alia, *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 763 (D.C. Cir. 2014) and *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524 (D.C. Cir. 1975)). For mandamus to issue under the All Writs Act,[5] "three conditions must be satisfied: (i) the petitioner must have 'no other adequate means to attain the relief he desires'; (ii) the petitioner must show that his right to the writ is 'clear and

---

[4] The majority places limitations on the mandamus standard that are inconsistent with Supreme Court and circuit precedent by asserting categorically that "the writ cannot be used 'to actually control the decision of the trial court.'" Maj. Op. 6 (quoting *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 245 (1964)) (alteration omitted). This contention directly contradicts the Supreme Court's more recent holding in *Cheney*, which stated that mandamus is appropriate when a court of appeals finds "a clear abuse of discretion." 542 U.S. at 390 (cleaned up). The majority's categorial rule also runs headlong into our recent decision in *In re Hillary Rodham Clinton & Cheryl Mills*, where we held that the district court abused its discretion and then we effectively controlled the decision of the trial court by granting former Secretary of State Clinton's petition for mandamus and "directing the district court to deny Judicial Watch's request" for depositions. No. 20-5056, slip op. at 5–6 (D.C. Cir. Aug. 14, 2020) (citations omitted).

[5] The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

indisputable'; and (iii) the court 'in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 747 (D.C. Cir. 2016) (quoting *Cheney*, 542 U.S. at 380–81).

Mandamus is appropriate in this case. First, the Executive Branch has a clear and indisputable right to control the initiation and dismissal of prosecutions. The "leave of court" authority under Rule 48(a) is narrow and does not permit a district court to countermand the Executive's decision to dismiss a prosecution.[6] Fundamental principles of separation of powers require that individuals be prosecuted only by democratically accountable prosecutors, not by district judges with life tenure. The district court's actions here exceed the proper judicial role and impair the Executive's performance of its prosecutorial functions. *See Cheney*, 542 U.S. at 380–82.

Second, the Executive Branch has no adequate alternative remedy to mandamus. Even if the district court ultimately

---

[6] Although the majority suggests that it might be improper to consider harms to the government, Maj. Op. 9–10, our court has rejected the formalist argument that the government must "file a separate petition for mandamus" before we may consider its irreparable harms, *Cobell v. Norton*, 334 F.3d 1128, 1140 n.* (D.C. Cir. 2003). It was therefore appropriate to credit the government's interests once it chose to support the petition. Moreover, Flynn properly raised constitutional harms arising from the judicial usurpation of executive power. *Cf. Bond v. United States*, 564 U.S. 211, 222 (2011) (explaining that "[t]he structural principles secured by the separation of powers protect the individual" and "the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers").

grants the motion to dismiss, that would not alleviate the harms resulting from the supervision and inquisition delineated by the district court in its orders and briefing. As we have previously recognized, such an infringement upon the Executive's charging authority "inflicts an 'irreparable injury'" for which an appeal is not an adequate alternative remedy. *Fokker Servs.*, 818 F.3d at 749 (quoting *In re al-Nashiri*, 791 F.3d 71, 79 (D.C. Cir. 2015)). Forestalling such irreparable harm to the Executive Branch makes mandamus appropriate here because the district court has adopted a flawed view of its authority in a manner that infringes on the exclusive constitutional powers of a separate and independent branch of government.

In denying the writ of mandamus, the majority relies only on its determination that Flynn and the Executive Branch have adequate alternative remedies, namely the eventual grant of the motion, the possibility of appeal, or even a writ of mandamus at some unspecified later time. Maj. Op. 7. The majority does not explain how these remedies would repair unlawful incursions on the Executive Branch. Instead, the majority dodges the constitutional questions by simply asserting a truism applicable to every mandamus case—a party could wait for an appeal or even a later mandamus petition. The ordinary availability of appeal does not relieve this court of its duty to examine the specific factual context of each mandamus petition and the precise irreparable harm alleged. We have no metric for judging the adequacy of alternative remedies without assessing the underlying harm—our cases demonstrate that the mandamus inquiry is holistic and its three prongs intertwined.

Nevertheless, the majority remains content with prospective remedies and sidesteps harms to the Executive. Our mandamus inquiry requires more than this piecemeal approach, particularly when grave separation of powers concerns are at stake. Judicial encroachments on the executive

power cannot be remedied simply by requiring the Executive to submit to a district court's supervision and then seek appeal. Mandamus is appropriate here.

A.

When reviewing a mandamus petition alleging harms to the Executive Branch, we often begin by analyzing whether the district court "overstepped its authority" in a manner that infringed on the Constitution's separation of powers. *See Fokker Servs.*, 818 F.3d at 740–47. Therefore, I first consider whether Flynn and the government have established a clear and indisputable right to the writ. To meet the standards for mandamus, they must demonstrate "the district court's decision constitutes a clear legal error," *id.* at 749 (citations and quotation marks omitted), such as a "judicial usurpation of power … or a clear abuse of discretion," *Cheney*, 542 U.S. at 390 (citations and quotation marks omitted). Here, clear legal error infects the proceedings below, which are shot through with improper judicial efforts to superintend the Executive Branch's prosecuting decisions. The harms are far from speculative, as the majority concludes, but instead are clearly laid out in the actions and representations of the district court. Such interference with the Executive Branch's decisionmaking is a judicial usurpation of power as well as an abuse of discretion under Rule 48(a).

The basic constitutional framework provides context for understanding how the district court's actions encroach on the executive power. At the outset, it is long established that the Executive Branch has the exclusive authority to initiate and halt prosecutions. The Constitution vests the Executive with the independent and unreviewable authority to decline to pursue criminal charges. *See, e.g.*, *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 283 (1987) ("[I]t is entirely clear that the

refusal to prosecute cannot be the subject of judicial review."); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.") (citations omitted); *Confiscation Cases*, 74 (7 Wall.) U.S. 454, 458 (1868); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Under Article II, the President ultimately decides "whether to initiate charges, whom to prosecute, which charges to bring, and whether to dismiss charges once brought," and "[i]t has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations."[7] *Fokker Servs.*,

---

[7] This fundamental separation of powers between the Judiciary and the Executive is well recognized in our sister circuits as well. *See, e.g.*, *United States v. HSBC Bank USA*, 863 F.3d 125, 137 (2d Cir. 2017) ("[A] federal court has no roving commission to monitor prosecutors' out-of-court activities just in case prosecutors might be engaging in misconduct."); *In re United States*, 791 F.3d 945, 958 (9th Cir. 2015) ("[I]nterference … risks … intruding upon the traditional prerogatives of the political branches. Courts should not risk becoming monitors of the wisdom and soundness of Executive action.") (cleaned up); *In re United States*, 503 F.3d 638, 641 (7th Cir. 2007) ("[A] judicial effort to supervise [a prosecutor's] process of reaching a decision intrudes impermissibly into the activities of the Executive Branch of government."); *id.* ("Judges in the United States resolve the parties' disputes rather than initiate their own factual inquiries on issues that the parties have not contested; that's a major difference between adversarial and inquisitorial systems."); *In re United States*, 398 F.3d 615, 618 (7th Cir. 2005) ("How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate."); *id.* ("The fundamental problem with this inquiry [into the motivations and decisionmaking of prosecutors] is that the United States Attorney is not answerable to a judge for the deliberations among his staff … [Judges'] temptation [to intrude] must be resisted in order to maintain

818 F.3d at 737. "The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). Under Article II, criminal charging decisions rest exclusively with the Executive Branch. This authority extends to all phases of trial: The President may decline to bring charges, dismiss charges once brought, or pardon offenders. *Id.* at 262–66 (collecting cases).

By contrast, the Article III judicial power includes no authority to initiate, pursue, or oversee decisions to prosecute. As the Supreme Court recently admonished, "courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (cleaned up). The judicial power includes the ability to adjudicate guilt and issue a sentence upon conviction. *See Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring in the judgment) ("The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy. See Art. III, § 2. That includes the power to serve as a neutral adjudicator in a criminal case, but does not include the power to seek out law violators in order to punish them."). The Article III courts have no power to make prosecutorial decisions. And for good reason. Lacking in political accountability to the people, judges have no mandate to pursue justice by choosing whom to prosecute.[8] If the public

separation between executive and judicial roles" and because "an inquisitorial role [is] inappropriate to the Judicial Branch.").

[8] Moreover, courts have no institutional capacity to determine where a particular prosecution fits into the broader scheme of law enforcement. Many alleged crimes go without prosecution—

disagrees with law enforcement decisions, it may hold the President and his Attorney General accountable. When the Executive declines to bring a prosecution, the court has no power to force a different result, a reality reinforced by the pardon power, U.S. CONST. art. II, § 2, which provides the President an unreviewable power to pardon individuals before trial, after conviction, or anytime in between. *Ex parte Grossman*, 267 U.S. 87, 120 (1925).[9]

It is against this constitutional backdrop that district courts must apply the "leave of court" requirement in Rule 48(a). All agree that the district court need not be a rubber stamp, but similarly, the district court cannot second-guess the prosecutorial decisions of the Executive Branch or force the Executive to maintain a prosecution it wishes to halt. These "settled constitutional understandings," *Fokker Servs.*, 818 F.3d at 741, establish that Rule 48(a)'s "leave of court" requirement "confers no new power in the courts to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions," *id.* at 743. Nothing in the text of Rule 48(a) "purports to deprive the Executive Branch of its historical prerogative to decide which cases should go forward in the name of the United States." *Swift v. United States*, 318 F.3d 250, 253 (D.C. Cir. 2003).

decisions must be made about the available evidence, the likelihood of a successful prosecution, the claims of justice compared to other similar crimes, and many other considerations. *See Wayte v. United States*, 470 U.S. 598, 607 (1985).

[9] "[A] judge could not possibly win a confrontation with the executive branch over its refusal to prosecute, since the President has plenary power to pardon a federal offender, U.S. Const. art. II, § 2, cl. 1—even before trial or conviction." *In re United States*, 345 F.3d 450, 454 (7th Cir. 2003).

Indeed, no appellate court has upheld a district court's denial of an unopposed Rule 48(a) motion, nor a decision appointing an outside attorney to probe whether the Executive Branch's dismissal is in the public interest.

The Judiciary's role under Rule 48(a) is thus confined to "extremely limited circumstances in extraordinary cases." *United States v. Hamm*, 659 F.2d 624, 629 (5th Cir. 1981); *United States v. Ammidown*, 497 F.2d 615, 621 (D.C. Cir. 1973) (emphasizing that Rule 48(a) motions must be granted "in the overwhelming number of cases"). Because "leave of court" is designed "to protect a defendant against prosecutorial harassment," *Fokker Servs.*, 818 F.3d at 742 (quoting *Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977)), Rule 48(a) permits only a circumscribed judicial role in the context of an unopposed motion to dismiss. Further judicial inquiry may be appropriate only if there is clear evidence of "bribery, animus towards the victim, or a desire to attend a social event rather than a trial—in other words, bad faith," *HSBC Bank USA*, 863 F.3d at 141 (citation and quotation marks omitted), or if it appears that a federal prosecutor is "acting alone rather than at the direction or with the approval of the Justice Department," *In re United States*, 345 F.3d at 454. Our precedent prohibits a district court's involvement in the Executive's exercise of prosecutorial discretion by scrutinizing, overseeing, countermanding, or second-guessing the Executive's considered judgment that the dismissal of criminal charges is in the public interest. *Fokker Servs.*, 818 F.3d at 741, 743, 744.

The majority retreats from any consideration of these bedrock principles by focusing exclusively on the fact that the district court has not yet concluded its proceedings. But we need not reach the end of those proceedings to recognize and provide a remedy for the ongoing harm to the Executive Branch. Whatever the scope of "leave of court" in Rule 48(a),

this authority does not encompass the wide-ranging inquiry set in motion by the district court, an inquiry that includes expansive factfinding to probe the internal decisionmaking of the Department. The majority maintains this is merely the "ordinary course." Maj. Op. 12. Yet the following actions and representations demonstrate that the district court's proceedings are anything but ordinary and the Executive Branch harms far from speculative:

- The district court appointed as amicus John Gleeson, after Gleeson had just written an op-ed arguing the government's Rule 48(a) motion "reeks of improper political influence" and advocating for the district court to hold "a full, adversarial inquiry," including "hearings to resolve factual discrepancies." Gleeson also suggested that the district court "compel the department to reveal … the actual evidence underlying the prosecution," and "order[] disclosure of" Executive Branch materials. John Gleeson, et al., Opinion, *The Flynn Case Isn't Over Until the Judge Says It's Over*, WASH. POST, May 11, 2020.

- After granting Gleeson's motion to hold a proceeding examining, inter alia, "any additional factual development [Gleeson] may need before finalizing [his] argument in opposition to the government's motion," Mot. of Amicus Curiae, *Flynn*, No. 1:17-cr-232, ECF 209, at 1 (D.D.C. May 15, 2020), the district court established a briefing and hearing schedule, Minute Order, *Flynn*, No. 1:17-cr-232 (D.D.C. May 19, 2020).

- Gleeson asked the district court to probe the government's motives for dismissing the case, affirmatively find the given reasons pretextual, and examine outside evidence—including presidential tweets and DOJ filings in other cases—to determine that the government acted in bad

faith.[10] Br. for Amicus Curiae, *Flynn*, No. 1:17-cr-232, ECF 225, at 26, 32–34, 38–39, 40–45, 57–59 (D.D.C. June 10, 2020),

- Gleeson also asked the court to consider the "background of a severe breakdown in the traditional independence of the Justice Department from the President" and to find that "[e]verything about this is irregular." *Id.* at 57, 59.

- In response to the petition for mandamus, the district judge asserted that he must resolve several factual questions and "inquir[e] into the facts set forth in, and surrounding, the government's filing," and determine whether these facts "provide reason to question the presumption of regularity that ordinarily attaches to prosecutorial decisions." Sullivan Panel Br. 1–2 (cleaned up).

- The district judge further maintained that he will require additional information about why "[t]he motion did not explain the absence of any line prosecutors, including those who had previously prosecuted the case … [or] contain any declarations or affidavits from witnesses with personal knowledge supporting the government's new factual representations"; why "the motion does not mention Mr. Flynn's March 2017 false statements to DOJ relating to his

---

[10] Relying on counsel for the district judge, the majority states that amicus "does not seek discovery or an evidentiary hearing." Maj. Op. 11. This overlooks what the amicus brief says, which is that the district court should conduct extensive factfinding into the motives and decisionmaking of the Department. Br. for Amicus Curiae, *Flynn*, No. 1:17-cr-232, ECF 225, at 49–60 (D.D.C. June 10, 2020). Perhaps amicus does not specifically seek discovery to support his opposition to the government's motion; however, amicus unmistakably advocates for detailed factfinding by the district court.

work for Turkey, which … were relevant conduct for his guilty plea"; and why "the government has not moved to withdraw any of its prior pleadings in the case, including its sentencing memoranda, or any of the representations it previously made in open court regarding the purported materiality of Mr. Flynn's false statements." *Id.* at 15–16.

- The district judge also suggested that he will make "[a] finding" regarding whether "the Government's later efforts to terminate the prosecution were … tainted with impropriety" and that he "can—and arguably must" "question the bona fides of the government's motions." *Id.* at 28–29 (cleaned up).

- The district judge will use the proceedings to determine "unanswered questions of fact"; to "resolve some of the factual and legal questions that remain outstanding"; "to inquire whether the government maintains its factual representations that Mr. Flynn is guilty as to those false statements"; and to "illuminat[e] the full circumstances surrounding the proposed dismissal and the government's current position on Mr. Flynn's conduct." Sullivan Panel Reply 1, 10–12.

- In his petition for rehearing en banc, the district judge asserted he has the authority to "develop[] [his] own record of the prosecution's charging decisions" and "confront[] government attorneys with their statements during trial that undermine[] their motion to dismiss." En Banc Pet. 6–7 (citations and quotation marks omitted).

- The district judge also stated he will use the proceedings to go beyond the four corners of the government's motion to dismiss because "it is hard to imagine that such

'malfeasance' would be apparent on the face of the government's motion." *Id.* at 13 n.2.

These proceedings and representations make clear the breadth and depth of the district judge's inquiry, which includes factual development of DOJ's motives and internal decisionmaking. The district judge has stated that he will look outside the government's motion to search for evidence that the presumption of regularity has been overcome. But this is to give the government no presumption of regularity at all. As we recently explained in granting a writ of mandamus to former Secretary of State Hillary Clinton, "[t]he mere suspicion of bad faith on the part of the government" cannot overcome the presumption of good faith. *In re Hillary Rodham Clinton*, No. 20-5056, slip. op. at 12. The district judge identifies nothing on the face of the government's motion to dismiss that overcomes the presumption of regularity to which the Executive is entitled. Nor does the district judge offer any evidence of bribery, animus, or other similar reasons for digging into the internal workings of the Executive Branch.

The majority does not address the substance of the district court's proceedings or the clear representations about the scope of inquiry, asserting only that "it is simply not the case that the Executive will be irreparably harmed by the procedures ordered by the District Court." Maj. Op. 9. To reach this result, the majority relies heavily on counsel's assurances at oral argument that the district judge *probably* will not engage in factfinding and *may* grant the motion to dismiss. Maj. Op. 7, 11–12. But these tentative assurances are plainly contradicted by the district judge's actions as well as his representations in multiple briefs before this court.[11] Counsel's remarks at oral

---

[11] The majority notes that counsel for the district judge states there is uncertainty about the proceedings and that the district judge "has not

argument cannot make speculative the many clear representations in the district judge's briefs.

While it is at least irregular for a district judge to retain counsel in responding to a mandamus petition, *see* Dissenting Op. 6 (Henderson, J.), it is even more peculiar for the majority to credit counsel's representations at oral argument as evidence that the contemplated harms are speculative. It is unclear to what extent counsel can make concessions regarding the future proceedings of an independent Article III judge. This is just another reason the majority would do better to rely on the district judge's statements in his orders and briefs when assessing the harms of the proceedings. By shutting its eyes to the irreparable harms and failing to pronounce as improper this probing inquisition, the majority emboldens the district court to make good on its pledge to superintend and fact check the Executive.

We simply have no basis for assuming, as the majority does, that the proceedings will steer clear of the elaborate factfinding and evidence gathering process aimed at uncovering "malfeasance" by the Department. The district court candidly states the scope of its inquiry, but that inquiry goes too far because a court may not "deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority." *Fokker Servs.*, 818 F.3d at 742. Yet this type of disagreement appears to be animating the district court's contemplated proceedings, complete with developing a factual record and scrutinizing the government's motives and decisionmaking. The actual

---

determined what questions, if any, he may have after reviewing the briefs." Maj. Op. 11 & nn.4–5. Yet the district judge's filings belie counsel's statements and in fact set out numerous specific questions to be answered in the proceedings. *See supra* 16–19.

proceedings may be a "still-unfolding process," Maj. Op. 10, but the content of the process has been clearly delineated. The harms occur from subjecting the Executive to this judicial inquiry because a district court has no authority to oversee or to superintend the prosecutorial decisions of the Executive Branch. *See Fokker Servs.*, 818 F.3d at 741 (noting "systemic costs" of judicial supervision over prosecutions) (quoting *Wayte*, 420 U.S. at 608).

In reaching this conclusion, I note that it takes nothing from the substantial judicial power to recognize that a single district court cannot step into the shoes of the Attorney General. As John Marshall explained, "[T]he nation may at will stop [a] prosecution. In this respect the President expresses constitutionally the will of the nation; and may rightfully … direct that the criminal be prosecuted no farther. This is no interference with judicial decisions, nor any invasion of the province of a court. It is the exercise of an indubitable and Constitutional power." *See* 6 ANNALS OF CONG. 615 (1800). To state what should be obvious, finding a harm justifying mandamus is not a commentary on the wisdom of the Department's prosecutorial decisions regarding Flynn. Rather, a grant of mandamus in this case would recognize that the district court abused its discretion and usurped the Executive Branch's exclusive constitutional power to dismiss a prosecution.

B.

The majority does not grapple with these harms, but instead argues that Flynn and the government have an adequate alternative remedy, namely, pursuing relief after the district court decides the motion to dismiss. The majority establishes a novel and effectively categorical rule that "a petition for mandamus filed in anticipation of a district court argument is

almost invariably premature." Maj. Op. 11. Such a rule, however, flies in the face of Supreme Court and circuit precedent, which recognize that a writ of mandamus must issue when a district court sets out a course that will result in an unwarranted intrusion on the Executive Branch, irrespective of whether the district court has already held a hearing or decided a particular motion. The majority maintains that appeal is an adequate alternative remedy only by disregarding the harms to the Executive Branch. The mandamus standard, however, treats the harm and adequate remedy as two sides of the same coin.

Upon finding a district court has encroached on the executive power, we have granted mandamus as a matter of course, even if it stymied further proceedings, factfinding, or discovery by the district court. For instance, in *In re Cheney*, we noted that the district court had not yet ruled on a motion to dismiss, but we nonetheless granted partial mandamus to modify a discovery order to prevent "interrupt[ion]" of "[t]he duties of high-ranking executive officers." 544 F.3d 311, 314 (D.C. Cir. 2008). Similarly, in *In re Sealed Case No. 98-3077*, we held that a district court's "procedural orders" subjecting the independent counsel to "discovery and an adversarial hearing" would cause irreparable injury to the government. 151 F.3d 1059, 1065 (D.C. Cir. 1998). Because the discovery period and hearing would "divert petitioner's focus … from directing the grand jury investigation at a crucial juncture," *id.* at 1066, this court granted the independent counsel's petition and vacated "the procedural aspects of the district court's orders," *id.* at 1077.

Likewise, in *Cobell*, we held that mandamus was appropriate to vacate the appointment of a "court monitor" to oversee the Department of the Interior's compliance with a court order. 334 F.3d at 1139–40. We concluded that the

district court had no inherent authority to make such an appointment over the government's objection that "the appointment violated the separation of powers." *Id.* at 1141–42. Finally, in *Nixon v. Sirica*, this court held that separation of powers concerns could justify mandamus even if "direct appeal" was available "as an alternative basis for review." 487 F.2d 700, 707 & n.21 (D.C. Cir. 1973). The court held that appeal after judgment or non-compliance with an order was not adequate because the "central question that the President raises—whether the District Court exceeded its authority in ordering an *in camera* inspection of the tapes—is essentially jurisdictional." *Id.* at 707. Thus, waiting for direct appellate review was "a clearly inadequate remedy" because the Executive need not submit to actions beyond the district court's jurisdiction. *Id.* (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 385 (1947)). The majority is simply wrong that we have never issued the writ before a district court has concluded its proceeding.

In the face of alleged incursions on the executive power, the irreparable harm inquiry focuses on the substance of the district court's actions, not the timing of whether it has ruled on a motion. Here, the district court's actions substantially harm the Executive. Although the government and Flynn both support the motion to dismiss, the district court contemplates an adversarial hearing, with amicus appointed to maintain a manufactured adversity in a criminal prosecution. *See* Maj. Op. 12 (noting that district court "appointed *amicus* to ensure adverse presentation of the issues").[12] *Cf. In re Sealed Case No.*

---

[12] The majority finds no intrusion into the executive power with the appointment of amicus in part because the Supreme Court sometimes uses amici to assist "in similar circumstances, including in criminal cases and even when the movant is the government." Maj. Op. 10. Yet the only cases cited by the majority are inapposite because they

*98-3077*, 151 F.3d at 1065–66. Moreover, the district court asserted an "inherent authority" to appoint the amicus, Order Appointing Amicus Curiae, *Flynn*, No. 1:17-cr-232, ECF No. 205, at 1 (D.D.C. May 13, 2020), but in *Cobell* we explained that "[a] judicial claim to an 'inherent power' is not to be indulged lightly, lest it excuse overreaching '[t]he judicial Power' actually granted to federal courts by Article III of the Constitution of the United States, and the customs and usages that inform the meaning of that phrase," 334 F.3d at 1141. The district court's pursuit of additional facts outside the motion to dismiss is analogous to an overbroad discovery order, because the district court seeks disclosure of information to which it is not entitled—such as information about the Executive Branch's internal decisionmaking process.[13] Although the usual rule for contested discovery orders is to disobey them and then appeal any adjudicated contempt, *In re Sealed Case No. 98-3077*, 151 F.3d at 1063–66, we have frequently held that mandamus may be justified in those cases where such a process

---

involve appointment of amici to address a purely legal question defending the constitutionality of a statute. *Id.* (citing *Dickerson v. United States*, 530 U.S. 428, 441 n.7 (2000), and *Pepper v. United States*, 562 U.S. 476, 487 (2011)). In this case, however, amicus was not retained to present purely legal arguments, but to oppose the government's motion to dismiss and the exercise of prosecutorial discretion at the heart of that motion.

[13] As the Acting Solicitor General noted at oral argument, the internal decisionmaking process could have included information not presented to the district court. "I just wanted to make clear that it may be possible that the Attorney General had before him information that he was not able to share with the court. And so what we put in front of the court were the reasons that we could, but it may not be the whole picture available to the Executive Branch." Oral Arg. Tr. at 64:11–16.

would not be an appropriate remedy, *cf. In re Hillary Rodham Clinton*, No. 20-5056, slip op. at 7–8.[14]

The majority appears to recognize that the district court's "disposition" or "other order" could intrude upon the Executive, and if such harm occurs, the Executive has the "possibility of future mandamus relief." Maj. Op. 12. The majority's reasoning suggests that mandamus later is an adequate remedy to mandamus now. But the district court has already taken actions that, in the government's view, "violate the separation of powers." *Id*. It is not clear what precise harm the majority is waiting for or what more the Executive would have to allege. Counsel for the district judge suggested that if the hearing focuses on impermissible factfinding, the government could raise objections and even seek appellate review then, including presumably before the district court's final decision on the motion to dismiss. Oral Arg. Tr. at 123–125; 142–145.

But the Executive need not resort to multiple mandamus petitions to challenge each separate intrusion during a process of factfinding. Instead, the Supreme Court has made clear that mandamus can and should issue before a proceeding spirals out of control. In *Cheney*, the Supreme Court rebuked this court for downplaying "the burden that would arise from the District

---

[14] *See also In re Kellogg*, 756 F.3d at 761 (noting that "forcing a party to go into contempt is not an 'adequate' means of relief" when the information is potentially privileged) (citing *In re Sealed Case No. 98-3077*, 151 F.3d at 1064–65); *In re SEC ex rel. Glotzer*, 374 F.3d 184, 187–88 (2d Cir. 2004) (observing that "there is a marked difference between requiring a private litigant to submit to a contempt order before seeking appellate relief and requiring executive agency officials to do so").

Court's insistence that the Vice President winnow the discovery orders by asserting specific claims of privilege and making more particular objections." 542 U.S. at 389 (citations omitted). Postponing mandamus to allow an intrusive hearing process to play out leaves the Executive with the "sole option" of asserting piecemeal objections and sets the "coequal branches of the Government … on a collision course." *Id.* The path cleared by the majority will force the Executive to make specific objections to each question or request for further facts about the Department's internal decisionmaking—questions the district court steadfastly maintains are necessary. This approach places courts "in the awkward position of evaluating the Executive's claims of confidentiality and autonomy" and "balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id.* The All Writs Act mandamus was designed to prevent such "constitutional confrontation[s]" between the Judiciary and the Executive. *Id.* at 389–90 (cleaned up).

Wishful waiting cannot forestall the irreparable harm to the Executive Branch. Because there are no adequate alternative means to prevent judicial incursions on the executive power—harms that also directly impact the individual liberty of Flynn—mandamus must issue.

## C.

Finally, we must determine whether, in the exercise of our discretion, issuance of the writ "is appropriate under the circumstances." *Id.* at 381 (citing *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 403 (1976)). Mandamus under the All Writs Act is understood as a supervisory and discretionary power. The final prong of the *Cheney* test rests in part on our judgment and requires us to look at the "totality of the circumstances." *In re Hillary Rodham Clinton*, No. 20-

5056, slip op. at 19. Because the district court's actions indicate a superintendence of prosecutorial discretion that goes beyond the judicial power and any reasonable inquiry to grant "leave of court" under Rule 48(a), issuing the writ at this juncture is appropriate. *See Cheney*, 542 U.S. at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities.") (citing *Ex parte Peru*, 318 U.S. at 587).

Upon a finding of irreparable harm to the Executive, we readily conclude that mandamus is appropriate, often without further analysis. *See Fokker Servs.*, 818 F.3d at 750. Because the majority does not grapple with the harms to the government, it also glosses over the appropriateness of mandamus. While our cases rarely discuss this prong in detail, our recent decision granting a writ of mandamus to Clinton provides an instructive discussion of the appropriateness analysis. We explained the appropriateness of issuing mandamus when necessary to prevent trial courts from committing similar errors in the future. *In re Hillary Rodham Clinton*, No. 20-5056, slip op. at 19. We found it relevant that the district court had a "deeply flawed view" of the law, specifically, the Freedom of Information Act ("FOIA") and Rule 26, and had issued a discovery order that "traveled far afield from the narrow issue" in the case. *Id.* at 20. We further explained that the district court "may not order discovery to probe any subject that piques curiosity," *id.*, and that "mere speculation" about the existence of certain materials could not support the further discovery ordered by the district court, *id.* at 21 (cleaned up). Although the majority attempts to distinguish our recent decision from the case at bar, nearly identical considerations make mandamus appropriate for Flynn—indeed, even more appropriate because the harms at stake involve the individual liberty of a criminal defendant and

the constitutional prerogatives of the Executive Branch, rather than a discovery request made in civil FOIA litigation.

To begin with, there can be little question that the district court must ultimately grant the government's motion to dismiss. "In fact, it would be highly unusual if it did not, given the Executive's constitutional prerogative to direct and control prosecutions and the district court's limited discretion under Rule 48(a)." Concurring Op. 2 (Griffith, J.). If the district court denies the government's request, this case will be in exactly the same posture as *Fokker Services*, where we granted mandamus to "correct" the district court's intrusion on the Executive Branch's prosecutorial discretion. 818 F.3d at 747. For the district court to deny the motion would be unprecedented: No party has been able to identify a case in which a court of appeals has upheld the denial of an unopposed Rule 48(a) motion, and the circumstances here hardly warrant a break from this practice. The ultimate result is not in doubt, which underscores the appropriateness of the mandamus remedy to stop the intrusions into the Executive Branch. *Cf. Cheney*, 542 U.S. at 382 ("[T]he action of the political arm of the Government taken within its appropriate sphere [must] be promptly recognized, and … delay and inconvenience of a prolonged litigation [must] be avoided by prompt termination of the proceedings in the district court.") (quoting *Ex parte Peru*, 318 U.S. at 587).

Furthermore, speculation and "pique[d] curiosity" cannot justify judicial supervision of the Executive Branch. *In re Hillary Rodham Clinton*, No. 20-5056, slip. op. at 20. The district court has pointed to nothing that overcomes the presumption of regularity to which the government is entitled regarding its motion to dismiss. Rather, by maintaining that it must ferret out additional facts to uncover any "malfeasance," the district court has "traveled far afield," *id.*, from its limited

role in reviewing unopposed motions to dismiss. Moreover, as explained above, the district court here has advanced "a deeply flawed view" of Rule 48(a) and the relevant constitutional background. *Id*. Mandamus is thus appropriate to "forestall future error in trial courts," *id*. at 23 (citation and quotation marks omitted), when considering unopposed motions to dismiss under Rule 48(a). *See also Fokker Servs.*, 818 F.3d at 750 ("In short, the novelty of the District Court's … ruling, combined with its potentially broad and destabilizing effects in an important area of law, justify granting the government's petition for a writ of mandamus.") (cleaned up). The majority's unwillingness to grapple with the manifest harms to the Executive muddies our mandamus standards and the directions we send to the district courts.

Mandamus is also appropriate to allow the Executive to self-correct the myriad law enforcement and prosecutorial errors the Department has candidly confessed. In its motion to dismiss, the Department details problems with the investigation and prosecution, including: the FBI's reopening of the investigation despite having found an "absence of any derogatory information"; the lack of "a substantial federal interest in penalizing a defendant for a crime that [the government] is not satisfied occurred"; the lack of a properly predicated investigation; the FBI's rogue investigation undertaken without DOJ approval; and the circumvention of protocol in conducting Flynn's White House interview. Motion to Dismiss Information, at 3–12 (internal citations omitted). Despite this parade of horribles in the *prosecution* of Flynn, the district court speculates that perhaps the real "malfeasance" might have occurred with the motion to *drop the prosecution*. The essential judicial power to determine guilt and innocence does not authorize a similarly vigorous role in granting "leave of court" to dismiss a prosecution. To the contrary, in our system of separated powers, the Judiciary has no inquisitorial

role in maintaining prosecutions the Executive chooses to dismiss.

Finally, the harms to Flynn also weigh in favor of the appropriateness of the writ. The majority takes consolation in the fact that Flynn is not "in confinement," Maj. Op. 8, but Flynn cites numerous harms stemming from protracted litigation, including his continued submission to weekly reporting requirements; the government's custody of his and his son's property, including his passport; and his inability to travel. I have focused my analysis on the harms to the Executive Branch because our cases maintain that "the burdens of litigation are normally not a sufficient basis for issuing the writ." *In re al-Nashiri*, 791 F.3d at 80. We have recognized, however, that "at some point, even the temporary subjection of a party to a Potemkin jurisdiction so mocks the party's rights as to render end-of-the-line correction inadequate." *United States v. Microsoft Corp.*, 147 F.3d 935, 954 (D.C. Cir. 1998). Our recent grant of mandamus to prevent the burden of sitting for depositions of broad "scope and complete irrelevance," *In re Hillary Rodham Clinton*, No. 20-5056, slip op. at 9, reinforces the appropriateness of mandamus for the far more severe burdens on Flynn's liberty from the proceedings before the district court.

\* \* \*

This case highlights the essential connection between the Constitution's structure of separated powers and the liberty interests of individuals. While modern administrative government often blurs the separation of powers, at least in criminal cases courts have steadfastly policed the separation of powers, ensuring that a criminal defendant may lose his liberty only upon action by all three branches of the government. By allowing the district court to scrutinize "the reasoning and

motives" of the Department of Justice, En Banc Pet. 13 (quotation marks omitted), the majority ducks our obligation to correct judicial usurpations of executive power and leaves Flynn to twist in the wind while the district court pursues a prosecution without a prosecutor. The Constitution's separation of powers and its protections of individual liberty require a different result. I respectfully dissent.